674 F.2d 921
 218 U.S.App.D.C. 262, 8 Media L. Rep. 1190
 COMMON CAUSE, et al.
v.
NUCLEAR REGULATORY COMMISSION, et al., Appellants.
COMMON CAUSE and David Cohen
v.
NUCLEAR REGULATORY COMMISSION and John F. Ahearne, Chairman,
Appellants.
COMMON CAUSE, et al.
v.
NUCLEAR REGULATORY COMMISSION, et al., Appellants.
 Nos. 81-1975, 81-2002 and 81-2147.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 24, 1981.
Decided Feb. 26, 1982.
 
 Appeals from the United States District Court for the District of Columbia (D.C. Civil Action No. 80-02347).
 Jason D. Kogan, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., at the time the brief was filed, Washington, D. C., Kenneth M. Raisler and Royce C. Lamberth, Asst. U. S. Attys., James Fitzgerald, Acting Sol., Nuclear Regulatory Commission, and Harvey Shulman and C. Sebastian Aloot, Attys., Nuclear Regulatory Commission, Washington, D. C., were on the brief, for appellants.
 Donald J. Simon, with whom Ellen G. Block, Washington, D. C., was on the brief, for appellees.
 Before WRIGHT, WILKEY and GINSBURG, Circuit Judges.
 Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.
 J. SKELLY WRIGHT, Circuit Judge:
 
 
 1
 The Government in the Sunshine Act, 5 U.S.C. § 552b (1976), requires that meetings of multi-member federal agencies shall be open to the public, with the exception of discussions in ten narrowly defined areas.[1] In these cases we must decide an important unresolved issue: whether any of the statutory exemptions from the Sunshine Act apply to agency budget deliberations. Interpreting the statutory language in light of the legislative history and underlying policies of the Act, we conclude that there is no blanket exemption for agency meetings at any stage of the budget preparation process. The availability of exemptions for specific portions of budgetary discussions must be determined upon the facts of each case.
 
 
 2
 In the proceedings before us the Nuclear Regulatory Commission (Commission) has failed to bear its burden of proving that its budget meetings of July 25, 1981 and October 15, 1981 were lawfully closed or that it may continue to withhold the transcripts of those meetings. We therefore order the Commission to release the transcripts to the public. We find, however, that the District Court's injunction of July 2, 1981, ordering the Commission to hold some of its future meetings in public, fails to satisfy the specificity requirements of Rule 65(d) of the Federal Rules of Civil Procedure. We vacate the injunction, 522 F.Supp. 457, and the District Court's order, 522 F.Supp. 608, holding the Commission in contempt for violating the injunction.
 
 I. STATEMENT OF THE CASE
 
 3
 Three interrelated cases have been consolidated in this appeal. Each case turns on the lawfulness of a decision by the Nuclear Regulatory Commission to close a meeting to discuss the agency's budget proposals. In each case the District Court ruled against the Commission. In No. 81-1975 the District Court held that the agency had acted unlawfully in closing a meeting on July 18, 1980, and ordered the Commission to refrain in the future from closing all meetings "similar in nature." Subsequently, in No. 81-2002, the court ruled that the Commission had violated the injunction by closing a meeting on July 25, 1981, and adjudged the Commission in civil contempt, which it could purge by releasing the transcript of the meeting. Finally, in No. 81-2147 the court held that the Commission had acted without statutory authorization when it closed a meeting on October 15, 1981, and ordered release of the transcript. The orders in Nos. 81-2002 and 81-2147 have been stayed pending the determination of this appeal.
 
 
 4
 A. No. 81-1975: Commission Meeting on July 18, 1980
 
 
 5
 In July 1980 the Commission scheduled a series of meetings to discuss preparation of the agency's annual budget request for fiscal year 1982, and announced that the sessions would be open to the public.[2] Before the first of the meetings on July 18, 1980, however, the three Commissioners who were present voted unanimously to close all of the budget meetings scheduled to be held within the next 30 days. Joint Appendix (JA) 19. The Commission relied solely on Exemption 9(B) of the Sunshine Act, which permits closing of meetings if premature disclosure of the discussion would be "likely to significantly frustrate implementation of a proposed agency action." 5 U.S.C. § 552b(c)(9) (B) (1976). A representative of appellee Common Cause, who wished to attend the July 18, 1980 meeting, was excluded.[3] At that meeting the Commissioners received a preliminary briefing from the staff concerning the Commission's budgetary needs and the relationship of each office's budget requests to agency and Office of Management and Budget (OMB) guidelines and previous appropriation levels.[4]
 
 
 6
 Common Cause filed suit in the District Court on September 15, 1980, seeking a declaratory judgment that closure of the July 18, 1980 meeting had violated the Sunshine Act, an injunction ordering release of the transcript of that meeting, and an order to the Commission to permit Common Cause to attend future Commission meetings "that are similar in nature to the July 18, 1980 meeting (.)" JA 5-8.[5] The parties filed cross-motions for summary judgment. The Commission asserted that Exemption 9(B) permitted closing of the meeting and allowed the transcript to be withheld from the public until the President submitted his budget to Congress in early 1981.[6]
 
 
 7
 In a memorandum opinion and order issued on July 2, 1981, JA 69-72, the District Court granted summary judgment for Common Cause. The court ruled that the Commission had unlawfully closed its July 18, 1980 meeting, which it described as a discussion of "the general proposed budget requests of the NRC and the general relationship between those requests and various budgetary documents." JA 70. On the basis of its inspection of the transcript the court decided that the Commission had "failed to establish a reasonable likelihood of any harm to future agency actions by opening budget discussion meetings." JA 71. It therefore found that Exemption 9(B) was inapplicable, and it enjoined the Commission permanently "from closing future meetings of a similar nature." JA 72. It did not specify the characteristics of the July 18, 1980 meeting which it considered material, nor did it describe with any particularity the future meetings which it ordered to be held in public.[7]
 
 
 8
 B. No. 81-2002: Commission Meeting on July 27, 1981
 
 
 9
 In July 1981 the Commission scheduled a series of meetings to discuss its budget request for fiscal year 1983. On the advice of its General Counsel it divided these meetings into two categories: preliminary staff briefings, designed to provide Commission members with background information and staff advice; and meetings in which the Commissioners would decide on specific funding levels for the agency's budget proposals to OMB (markup), and would also consider intra-agency appeals from initial markup decisions (reclama). It voted to hold the preliminary staff briefings, which it believed to be "similar in nature" to the July 18, 1980 meeting, in public.[8] However, it decided to close the markup/reclama meeting, originally scheduled for July 23, which eventually took place on July 27. It relied on Exemptions 2 and 6 as well as Exemption 9(B). Common Cause was notified of this decision on July 17, 1981. JA 81-82.
 
 
 10
 On July 21, 1981 Common Cause sought an order from the District Court enforcing the July 2, 1981 injunction by requiring the scheduled markup/reclama meeting to be held in open session. JA 73-80.[9] The court did not act immediately on the Common Cause motion. On July 27, 1981 the Commission held its markup/reclama meeting in closed session. The meeting discussed the Commission's final budget figures for submission to OMB, evaluated a number of regulatory programs, determined budgetary priorities, and selected strategies to maximize the budgetary resources that OMB might approve.
 
 
 11
 After reviewing the transcript of the closed meeting in camera, the District Court, at a hearing on August 25, 1981, ordered the Commission to release the transcript to the public. On September 9, 1981 the court issued a written order holding the Commission in contempt of court for closing the July 27, 1981 meeting. The memorandum accompanying the order gave a broad construction to the court's earlier injunction of July 2, 1981. The court explained that its order had been "made in a wider context than just resolving the legality of closing the prior year's July 18, 1980, budget discussion meeting." In their motions for summary judgment in that proceeding, the court wrote, both parties had argued the application of the Sunshine Act to "the entire budget development process." JA 259. Without referring specifically to any of the claimed Sunshine Act exemptions, the court found that the July 27 meeting was "similar in nature" to the July 18, 1980 meeting illegally closed by the Commission, JA 260, and that the Commission was guilty of civil contempt. The order allowed the Commission to purge its contempt by releasing the transcript within ten days; if it failed to do so its members were required to appear before the court for sentencing on September 28, 1981. JA 262.
 
 
 12
 On an emergency motion for stay pending appeal this court granted a stay of the September 9 contempt order of the District Court. It also advised the Commission to seek the approval of the District Court if, during the pendency of the appeal, it wished to close any meeting concerning the budget or similar matters. JA 265-266.
 
 
 13
 C. No. 81-2147: Commission Meeting on October 15, 1981
 
 
 14
 The Commission submitted its budget request to OMB in September 1981. OMB proposed substantial reductions in the Commission's budget, but gave the agency an opportunity to appeal (reclama) the cutbacks on or before October 19, 1981. The Commission sought the District Court's permission to hold a closed session to discuss the reclama to OMB. It argued that unless the discussion of its priorities, negotiation strategy, and fallback positions could be closed the agency's goal of minimizing OMB's reductions would be "significantly frustrated" within the meaning of Exemption 9(B). It also invoked Exemptions 2, 6, and 10 of the Sunshine Act.[10]
 
 
 15
 The District Court refused permission and ordered the meeting to be held in open session. Appendix to Memorandum for Appellants in No. 81-1247 (App.) at 32. On an emergency motion for stay pending appeal this court granted a partial stay of the District Court's order. App. 33. The stay permitted the Commission to close those specific portions of the meeting during which it discussed material exempt under Exemptions 2, 6, 9(B), and 10. This court also ordered the Commission to submit a verbatim record of both open and closed portions of the meeting to the District Court within four days of the meeting, and instructed the District Court to rule on the Commission's action but to stay its orders pending review on appeal. Id.
 
 
 16
 On October 15, 1981 the Commission held a two-part budget meeting to prepare its reclama to OMB. The first part, which dealt generally with the status of the Commission's budget request, was open to the public. The second part, which considered the specific budget items involved in the reclama, was held in closed session. After an in camera inspection of the transcript of the closed portion of the October 15 meeting, the District Court ordered the transcript released. The order, issued on October 22, 1981, stated without further explanation that "the Court finds exceptions 2 and 9(B) are not applicable." App. 36.
 
 
 17
 The Commission's appeals from all three District Court orders have been consolidated for hearing and determination. These cases raise three issues. First, was the District Court's injunction of July 2, 1981, which ordered the Commission to open all future meetings "similar in nature" to the July 18, 1980 meeting, sufficiently specific to comply with Rule 65(d)? Second, may budget meetings as a whole be closed to the public under Exemption 9(B) of the Sunshine Act? Third, does an inspection of the transcripts reveal that all or any portion of the meetings of July 27, 1981 and October 15, 1981 discussed exempt material and may therefore be withheld from the public?
 
 
 18
 We strike down the District Court's injunction of July 2, 1981 because it is too vague to satisfy the standards of Rule 65(d). Reaching the substantive Sunshine Act issues, we conclude that none of the exemptions to the Sunshine Act provides any blanket exception for budget discussions at any stage-preliminary staff budget briefings, markup/reclama meetings, or meetings to prepare reclama to OMB. On the basis of our inspection of the transcripts of the Commission's two closed meetings, we decide that no portion of either meeting is exempt from disclosure, and we therefore order that the full transcripts be released.
 
 II. THE JULY 2, 1981 INJUNCTION: RULE 65(d)
 
 19
 The District Court's injunction of July 2, 1981 cannot stand. Referring to the Commission's meeting of July 18, 1980, it provides that "defendant Nuclear Regulatory Commission is permanently enjoined from closing future meetings of a similar nature." JA 72. The order does not describe the July 18, 1980 meeting or identify the characteristics of a future meeting "of a similar nature." The phrase is susceptible to more than one interpretation.[11] It therefore fails to satisfy the exacting requirements of Rule 65(d) of the Federal Rules of Civil Procedure:
 
 
 20
 Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained * * *.
 
 
 21
 The Supreme Court has explained the fundamental policies underlying Rule 65(d). "The judicial contempt power is a potent weapon," the Court asserted. "When it is founded upon a decree too vague to be understood, it can be a deadly one. Congress responded to that danger by requiring that a federal court frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid." Internat'l Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n, 389 U.S. 64, 76, 88 S.Ct. 201, 208, 19 L.Ed.2d 236 (1967); see Gunn v. University Committee to End the War in Vietnam, 399 U.S. 383, 389, 90 S.Ct. 2013, 2017, 26 L.Ed.2d 684 (1970); Schmidt v. Lessard, 414 U.S. 473, 476-477 n.2, 94 S.Ct. 713, 715-16 n.2, 38 L.Ed.2d 661 (1974).
 
 
 22
 We recognize that the fair notice requirement of Rule 65(d) must be applied "in the light of the circumstances surrounding (the injunction's) entry: the relief sought by the moving party, the evidence produced at the hearing on the injunction, and the mischief that the injunction seeks to prevent." United States v. Christie Industries, Inc., 465 F.2d 1000, 1007 (3d Cir. 1972). In the context of the litigation, an injunction's language might be sufficiently specific to notify the parties of the acts the court seeks to restrain. See, e.g., Williams v. United States, 402 F.2d 47, 48-49 (10th Cir. 1967) (sustaining injunction in light of defendant's subjective knowledge).
 
 
 23
 In the circumstances of this case, however, the context of the court's decision to issue the injunction does not cure the ambiguity of the language of the injunction itself. Common Cause's complaint was no more specific than the court's July 2, 1981 order; it asked for an injunction "compelling defendants to permit plaintiffs to attend future Commission meetings that are similar in nature to the July 18, 1980 meeting(.)" JA 7. The evidence before the District Court consisted solely of the transcript of the July 18, 1980 meeting; the court did not consider the transcripts of other meetings which might have been "similar to" or "not similar to" the meeting in question. Nor does the memorandum opinion accompanying the order clarify its meaning. It describes the July 18 meeting in several different ways-in general terms as a "budget meeting," "budget review meeting," and "budget discussion meeting," as a "meeting concerning the fiscal year 1982 budget," and more specifically as a discussion of "the general proposed budget requests of the NRC and the general relationship between those requests and various budgetary documents." JA 69-71. Under the circumstances, we are compelled to conclude that the injunction of July 2, 1981 violated the specificity requirements of Rule 65(d).[12]
 
 
 24
 Because the July 2, 1981 injunction failed to give adequate notice to the Commission of the nature of the prohibited activity, we also set aside the District Court's decision of September 9, 1981 that the Commission was in contempt for violating the July 2 order. See Internat'l Longshoremen's Ass'n, supra, 389 U.S. at 76, 88 S.Ct. at 208 (reversing finding of civil contempt for alleged violation of vague decree); Ford v. Kammerer, 450 F.2d 279, 280 (3d Cir. 1971) (reversing contempt judgment because "ambiguities and omissions in orders redound to the benefit of the person charged with contempt").[13]
 
 III. THE SUNSHINE ACT AND THE BUDGET PROCESS
 
 25
 We turn now to the validity of the District Court's determinations, based on in camera inspection of the transcripts, that the Sunshine Act requires the Commission to release the transcripts of its closed meetings held on July 27 and October 15, 1981. See 5 U.S.C. §§ 552b(f)(2), 552b(h)(1) (1976).
 
 
 26
 The Government in the Sunshine Act establishes the policy that "the public is entitled to the fullest practicable information regarding the decisionmaking processes of the Federal Government."[14] Every meeting of a multi-member agency must be open to the public, except that specific portions of a meeting may be closed if the discussion is reasonably likely to fall within one or more of ten narrowly defined exemptions. 5 U.S.C. § 552b(c)(1)-(10) (1976). The Commission contends that these exemptions authorize closing of agency budget discussions.[15] It places primary reliance on Exemption 9(B), which allows an agency to close a meeting or portion of a meeting which is likely to discuss matters whose "premature disclosure" would "be likely to significantly frustrate implementation of a proposed agency action." Id. § 552b(c)(9)(B). The agency also contends that budget meetings may be closed because they encompass information protected under Exemption 2, matters related "solely to the internal personnel rules and practices of an agency," and Exemption 6, material of a personal nature whose disclosure would "constitute a clearly unwarranted invasion of personal privacy." Id. §§ 552b(c)(2), 552b(c)(6). In light of the language, legislative history, and underlying purposes of the Sunshine Act, we reject the Commission's proposed interpretations of the Sunshine Act exemptions.
 
 A. The Purposes of the Sunshine Act
 
 27
 Congress enacted the Sunshine Act to open the deliberations of multi-member federal agencies to public view. It believed that increased openness would enhance citizen confidence in government, encourage higher quality work by government officials, stimulate well-informed public debate about government programs and policies, and promote cooperation between citizens and government. In short, it sought to make government more fully accountable to the people.[16] In keeping with the premise that "government should conduct the public's business in public,"[17] the Act established a general presumption that agency meetings should be held in the open.[18] Once a person has challenged an agency's decision to close a meeting, the agency bears the burden of proof.[19] Even if exempt subjects are discussed in one portion of a meeting, the remainder of the meeting must be held in open session.[20]
 
 
 28
 The Act went farther than any previous federal legislation in requiring openness in government. In general the Sunshine Act's exemptions parallel those in the Freedom of Information Act (FOIA),[21] but there is an important difference. Unlike FOIA, which specifically exempts "predecisional" memoranda and other documents on the premise that government cannot "operate in a fishbowl,"[22] the Sunshine Act was designed to open the predecisional process in multi-member agencies to the public. During the legislative process a number of federal agencies specifically objected to the Sunshine Act's omission of an exemption for predecisional deliberations. Congress deliberately chose to forego the claimed advantages of confidential discussions among agency heads at agency meetings.[23]
 
 
 29
 Express language in the Sunshine Act also demonstrates that Congress did not intend to follow the FOIA pattern for predecisional discussions at agency meetings.[24] The Sunshine Act applies to all "meetings," which are defined as deliberations which determine or result in "the joint conduct or disposition of official agency business(.)" 5 U.S.C. § 552b(a)(2) (1976).[25] The legislative history demonstrates that "official agency business" means far more than reviewable final action. The Senate report expressly stated:
 
 
 30
 The definition of meetings includes the conduct, as well as the disposition, of official agency matters. It is not sufficient for the purposes of open government to merely have the public witness final agency votes. The meetings opened by Section 201(a) are not intended to be merely reruns staged for the public after agency members have discussed the issue in private and predetermined their views. The whole decisionmaking process, not merely its results, must be exposed to public scrutiny.
 
 
 31
 S.Rep.No. 94-354, 94th Cong., 1st Sess. 18 (1975).[26]
 
 
 32
 Notwithstanding the omission of a deliberative process privilege from the Sunshine Act, the Commission asks us to hold that the deliberative process leading to formulation of an agency's budget request is exempt from the Sunshine Act. To resolve this question, we must examine the statutory underpinnings of the budget process and the specific exemptions from the Sunshine Act which the Commission invokes.
 
 B. The Budget and Accounting Act of 1921
 
 33
 The Budget and Accounting Act, 42 Stat. 21 (1921), was designed to centralize formulation of the Executive Branch budget. Previously Congress had received "uncompared, unrelated, and unrevised" estimates from individual departments and agencies, "representing the personal views and aspirations of bureau chiefs(.)" S.Rep.No. 524, 66th Cong., 2d Sess. 6 (1920). The disadvantages of this uncoordinated system led Congress to delegate to the President exclusive authority to submit budgetary requests on behalf of the Executive Branch. 31 U.S.C. § 15 (1976). Congress thereby sought to enhance the government's ability to control the overall level of expenditures and to choose among conflicting priorities.[27]
 
 
 34
 The Commission contends that the Budget and Accounting Act mandates secrecy in the budget formulation process, and that the Sunshine Act must therefore be construed to permit closing of agency budget meetings. Brief for appellants at 17-21. We find this statutory argument unpersuasive.
 
 
 35
 The Commission first relies on the President's authority, under the Budget and Accounting Act, to prescribe rules and regulations for preparation of the budget, 31 U.S.C. § 16 (1976),[28] and on the "longstanding practice of confidentiality for Executive Branch discussions leading to the formulation of the President's Budget." Brief for appellants at 19.[29] The statute, however, makes no reference to confidentiality, nor does it authorize the President to prescribe budgetary rules and regulations without regard to the requirements of other federal statutes. The President's rulemaking authority under 31 U.S.C. § 16 is therefore subject to the specific requirements of the Sunshine Act. Indeed, the OMB directive to agencies, OMB Circular A-10, recognizes that "(c)ertain agencies headed by a collegial body may be required to hold their meetings open to public observation unless the agency properly determines that the matter to be discussed warrants the closing of those meetings for reasons enumerated in the Government in the Sunshine Act * * *." JA 130.[30]
 
 
 36
 Second, the Commission reasons that the congressional goal of centralized budget formulation cannot be achieved without secrecy. If the proposals of individual agencies must be adopted in public, it suggests, development of the presidential budget would be "fragmented" and the President's discretion to choose among alternatives would be impaired. Brief for appellants at 19-21. This contention reads too much into the 1921 Act, which simply requires that the President submit a single, unified Executive Branch budget proposal to Congress for consideration. It does not prescribe any method by which he must develop the consolidated budget figures which he submits. Nor does it require that the President's proposals be the only budgetary information available to the public.[31] Even if agencies discuss their budget proposals at public sessions, the President remains capable of revising agency requests and combining them into a unified budget.
 
 
 37
 Indeed, the Sunshine Act itself affords persuasive evidence that Congress did not intend to allow presidential claims of confidentiality under the Budget and Accounting Act to override the Sunshine Act's specific provisions regarding openness and secrecy. Exemption 3, a provision which received extensive consideration in both houses, allows closing of a meeting or portion of a meeting which would "disclose matters specifically exempted from disclosure by statute," provided that such statute
 
 
 38
 (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld(.)
 
 
 39
 5 U.S.C. § 552b(c)(3) (1976).[32] The Budget and Accounting Act of 1921, which contains no explicit references to confidentiality, does not qualify under the strict requirements of Exemption 3.
 
 
 40
 Therefore, the budget process is exempt from the open meeting requirement, in whole or in part, only if it fits within the terms of other specific Sunshine Act exemptions.
 
 C. No Blanket Exemption for Budget Meetings
 
 41
 Exceptions to the Sunshine Act's general requirement of openness must be construed narrowly. H.R.Rep.No. 94-880 (part 1), 94th Cong., 2d Sess. 2 (1976). Congress rejected the approach of establishing "functional categories" of agency business whose discussion could automatically be closed to the public.[33] Instead the Sunshine Act provides for an examination of each item of business to ascertain whether it may be closed under the terms of one of ten specific exemptions. Pacific Legal Foundation v. Council on Environmental Quality, 636 F.2d 1259, 1265 (D.C.Cir.1980). Exemptions must be interpreted in light of Congress' intention that agencies must "conduct their deliberations in public to the greatest extent possible." S.Rep.No. 94-354, supra, at 11. Nevertheless the Commission claims that Exemption 9(B) permits closing of agency budget meetings in their entirety.
 
 
 42
 Exemption 9(B) permits closing of meetings to prevent "premature disclosure" of information whose disclosure would be likely to "significantly frustrate implementation of a proposed agency action." For two reasons, the precept of narrow construction applies with particular force to this exemption, upon which the Commission principally relies. First, as we have seen, Congress decided not to provide any exemption for predecisional deliberations because it wished the process of decision as well as the results to be open to public view. See Part III-A supra.[34] Yet the agencies may attempt to seize upon the language of Exemption 9(B) to avoid the perceived discomfort and inconvenience that are, in the words of one commentary, "inherent in the open meeting principle * * *." R. Berg & S. Klitzman, An Interpretive Guide to the Government in the Sunshine Act 24 (1978). Second, an overly broad construction of Exemption 9(B), which applies to all agencies subject to the Act, would allow agencies to "circumvent the spirit of openness which underlies this legislation." S.Rep.No. 94-354, supra, at 20.
 
 
 43
 The language of the exemption is not self-explanatory; we therefore turn to the legislative history for guidance. The House and Senate committee reports give four concrete examples of Exemption 9(B) situations. First, an agency might consider imposing an embargo on foreign shipment of certain goods; if this were publicly known, all of the goods might be exported before the agency had time to act, and the effectiveness of the proposed action would be destroyed. Id. at 24. Second, an agency might discuss whether to approve a proposed merger; premature public disclosure of the proposal might make it impossible for the two sides to reach agreement. Id. at 24-25. Third, disclosure of an agency's proposed strategy in collective bargaining with its employees might make it impossible to reach an agreement. Id. at 24. Fourth, disclosure of an agency's terms and conditions for purchase of real property might make the proposed purchase impossible or drive up the price. Id.[35]
 
 
 44
 We construe Exemption 9(B) to cover those situations delineated by the narrow general principles which encompass all four legislative examples. In each of these cases, disclosure of the agency's proposals or negotiating position could affect private decisions by parties other than those who manage the federal government-exporters, potential corporate merger partners, government employees, or owners of real property. The private responses of such persons might damage the regulatory or financial interests of the government as a whole, because in each case the agency's proposed action is one for which the agency takes final responsibility as a governmental entity.
 
 
 45
 The budget process differs substantially from the examples given by the House and Senate reports. Disclosure of the agency's discussions would not affect private parties' decisions concerning regulated activity or dealings with the government. Rather, the Commission contends that opening budget discussions to the public might affect political decisions by the President and OMB.[36] In addition, disclosure would not directly affect "agency action" for which the Commission has the ultimate responsibility.[37] Instead, the Commission fears that disclosure of its time-honored strategies of item-shifting, exaggeration, and fall-back positions[38] would give it less leverage in its "arm's length" dealings with OMB and the President, who make the final budget decisions within the Executive Branch. The Commission argues that it would thereby be impaired in its competition with other government agencies-which also serve the public and implement federal legislation-for its desired share of budgetary resources.[39] It is not clear, however, whether the interests of the government as a whole, or the public interest, would be adversely affected.[40]
 
 
 46
 Moreover, in the budget context the public interest in disclosure differs markedly from its interest in the four situations described in the committee reports.[41] In those cases disclosure would permit either financial gain at government expense or circumvention of agency regulation. In contrast, disclosure of budget deliberations would serve the affirmative purposes of the Sunshine Act: to open government deliberations to public scrutiny, to inform the public "what facts and policy considerations the agency found important in reaching its decision, and what alternatives it considered and rejected," and thereby to permit "wider and more informed public debate of the agency's policies * * *." S.Rep.No. 94-354, supra, at 5-6.
 
 
 47
 The budget deliberation process is of exceptional importance in agency policymaking. The agency heads must review the entire range of agency programs and responsibilities in order to establish priorities. According to the Commission, a budget meeting "candidly consider(s) the merits and efficiencies of on-going or expected regulatory programs or projects" and then "decides upon the level of regulatory activities it proposes to pursue * * *." Brief for appellants at 30-31. These decisions, the government contends, have a significant impact on "the Commission's ability to marshal regulatory powers in a manner which insures the greatest protection of the public health and safety with the most economical use of its limited resources." Id. at 31.
 
 
 48
 If Congress had wished to exempt these deliberations from the Sunshine Act-to preserve the prior practice of budget confidentiality, to reduce the opportunities for lobbying before the President submits his budget to Congress, or for other reasons-it would have expressly so indicated. Absent any such statement of legislative intent, we will not construe Exemption 9(B) of the Sunshine Act to allow budget deliberations to be hidden from the public view.[42]
 
 
 49
 We are not persuaded by the Commission's contention that the separation of powers principle imposes a constitutional requirement that budget meetings be exempt from the Sunshine Act. The Commission suggests that Congress may not require agency budget meetings to be open to the public because openness would interfere with the Commission's role of providing opinions and advice to the President under Article II, Section 2 of the Constitution.[43] But the Supreme Court has recently rejected the contention that separation of powers requires "three airtight departments of government(.)" Nixon v. Administrator of General Services, 433 U.S. 425, 443, 97 S.Ct. 2777, 2790, 53 L.Ed.2d 867 (1977). Taking a "pragmatic, flexible" approach, the Court enunciated a functional test of whether separation of powers has been violated: "the extent to which (the challenged legislation) prevents the Executive Branch from accomplishing its constitutionally assigned functions." Id. at 442-443, 97 S.Ct. at 2789-90. The Court expressly included the Government in the Sunshine Act among the "abundant statutory precedent for the regulation and mandatory disclosure of (information) in the possession of the Executive Branch," noting that "(s)uch regulation of material generated in the Executive Branch has never been considered invalid as an invasion of its autonomy." Id. at 445, 97 S.Ct. at 2791.[44]
 
 
 50
 We express no view with regard to any constitutional issue of Executive privilege, a question which is narrower than the Commission's general claim based on separation of powers. See id. at 446, 97 S.Ct. at 2791. Only the President, not the agency, may assert the presidential privilege, see Freund, The Supreme Court, 1973 Term, Foreword: On Presidential Privilege, 88 Harv.L.Rev. 13, 29-31 (1974); see generally Nixon v. Administrator of General Services, supra, 433 U.S. at 447-449, 97 S.Ct. at 2792-93 and he has not done so in this case.[45]
 
 D. Particularized Exemptions
 
 51
 The Sunshine Act contains no express exemption for budget deliberations as a whole, and we do not read such an exemption into Exemption 9(B). We recognize, nevertheless, that specific items discussed at Commission budget meetings might be exempt from the open meetings requirement of the Act, and might justify closing portions of Commission meetings on an individual and particularized basis.[46] After examining the transcripts of the Commission's closed meetings of July 27, 1981 and October 15, 1981, however, we conclude that none of the subject matter discussed at either meeting comes within any of the exemptions cited by the Commission. The Commission must therefore release the full transcripts of these meetings to the public.
 
 1. Exemption 9(B)
 
 52
 Exemption 9(B), as we have discussed, protects agency discussions of material whose premature disclosure could affect the decisions or actions of third parties acting in a nongovernmental capacity, thus causing a significant adverse effect upon the government's financial or regulatory interests. See Part III-C supra. Budget meetings might include discussions of specific topics within the coverage of the exemption. Premature disclosure of possible elimination of a program involving private contracts might make it difficult for the contractor to retain key personnel, frustrating the Commission's ability to implement the program effectively if it is not ultimately eliminated. Memorandum for Appellants in No. 81-2147 at 23 n.20. Premature disclosure of proposed cutbacks in joint research projects with foreign governments might adversely affect the United States government's position in negotiations concerning the foreign government's commitment. Id. Premature disclosure of collective bargaining negotiation strategies might adversely affect labor negotiations with the Commission's own employees.[47]
 
 
 53
 Even if a budget meeting is likely to discuss these topics, however, it may not be closed under Exemption 9(B) "in any instance where the agency has already disclosed to the public the content or nature of its proposed action (.)" 5 U.S.C. § 552b(c)(9)(B) (1976). The Senate report explained that the exemption "only applies when an agency feels it must act in secret (.)" S.Rep.No. 94-354, supra, at 25. Therefore, if the private contractor, foreign government, or labor union has already been informed by the Commission that budget cutbacks are being considered in the programs with which they are concerned, then Exemption 9(B) might no longer apply.
 
 
 54
 Our in camera inspection of the transcripts of the July 27, 1981 and October 15, 1981 Commission meetings leads us to conclude that Exemption 9(B) does not support withholding of any portion of the transcripts.
 
 2. Exemption 2
 
 55
 The Commission also relies on Exemption 2-matters that "relate solely to the internal personnel rules and practices of an agency(,)" 5 U.S.C. § 552b(c)(2) (1976)-to justify closing portions of budget meetings. Under the Commission's interpretation, Exemption 2 includes discussions of allocation of personnel among programs, evaluations of the performance of offices and projects within the Commission, and consideration of more economical schemes of "internal management." Brief for appellants at 26; Memorandum for Appellants in No. 81-2147 at 23, 30. This construction is belied by the statutory language and legislative history of Exemption 2.
 
 
 56
 The language in Exemption 2 to the Government in the Sunshine Act is virtually identical with that in Exemption 2 to the Freedom of Information Act. 5 U.S.C. § 552(b)(2) (1976). The conference report on the Sunshine Act expressly adopts the standards of Dep't of Air Force v. Rose, 425 U.S. 352, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976),[48] the leading Supreme Court decision interpreting Exemption 2 of FOIA. See S.Rep.No. 94-1178, 94th Cong., 2d Sess. 15 (1976).[49] Under this standard, personnel-related discussions at budget meetings fall squarely outside the scope of the exemption.
 
 
 57
 Budget allocations inevitably impinge on personnel matters, because government cannot implement programs without personnel. Salaries and wages are a sizable proportion of the Commission's budget. But budget decisions regarding personnel cutbacks, and evaluations of the prior performance of offices and programs, do not relate solely to "internal personnel rules and procedures." Discussions of possible administrative cost savings through adoption of new "internal management" techniques also fall beyond the narrow confines of Exemption 2, because they deal with the impact of budget cuts on the Commission's ability to carry out its responsibilities.
 
 
 58
 Throughout this litigation the Commission has emphasized the importance of the budget process. An affidavit submitted by the Commission asserts that budget discussions lead to presidential recommendations reflecting the President's "best judgment of how the nation's fiscal resources should be allocated to meet its future economic and social needs." Affidavit of Carey P. Modlin, Office of Management and Budget, JA 118. The affidavit recognizes that "vital policies and billions of dollars (are) at issue every year(.)" Id. The public can reasonably be expected to have an interest in matters of such importance.[50] Exemption 2 does not permit the Commission to close budget discussions relating to personnel cutbacks or performance.
 
 
 59
 In some budget meetings the exemption might permit the Commission to close specific portions of the discussion relating "solely to internal personnel rules and practices." However, in camera inspection shows that Exemption 2 does not apply to any portion of either the July 27, 1981 or the October 15, 1981 meeting.
 
 3. Exemption 6
 
 60
 The government invoked Exemption 6 to justify its decisions to close both meetings at issue; it no longer claims that the exemption protects any of the deliberations at the October 15 meeting. Exemption 6 protects information of a personal nature whose disclosure would constitute "an unwarranted invasion of personal privacy(.)" 5 U.S.C. § 552b(c)(6) (1976). The agency contends that this exemption protects discussion of "an individual manager's particular qualifications, characteristics and professional competence in connection with a budget request for that particular manager's program." Brief for appellants at 26. This contention is unsupported by the legislative history of the Sunshine Act.
 
 
 61
 Exemption 6 applies to information of a personal nature, including discussions of a person's health, drinking habits, or financial circumstances. It provides greater protection to private individuals, including applicants for federal grants and officials of regulated private companies, and to low-level government employees, than to government officials with executive responsibilities. H.R.Rep.No. 94-880 (part 1), supra, at 11; S.Rep.No. 94-354, supra, at 21-22. It was not intended to shelter substandard performance by government executives. The Senate report expressly noted that "if the discussion centered on the alleged incompetence with which a Government official has carried out his duties it might well be appropriate to keep the meeting open, since in that case the public has a special interest in knowing how well agency employees are carrying out their public responsibilities." Exemption 6, the report added, "must not be used by an agency to shield itself from political controversy involving the agency and its employees about which the public should be informed." Id. at 21-22.[51] These policy considerations apply a fortiori in the budget process, in which the performance of individual executives may affect the Commission's willingness to allocate budgetary resources to particular regulatory programs.
 
 
 62
 Given the narrow scope of Exemption 6 as applied to managerial officials, we hold that no portion of the discussion at the July 27, 1981 meeting was covered by Exemption 6. The Commission's discussion of individual performance was limited to managerial officials with executive responsibility.[52]
 
 E. Compliance With the Sunshine Act
 
 63
 Our in camera inspection of the transcripts of the July 27, 1981 and October 15, 1981 Commission meetings does not show that any portion of either meeting may be withheld from the public under any of the asserted exemptions to the Sunshine Act. We therefore order the Commission to release the transcripts to the public. 5 U.S.C. § 552b(f)(2) (1976). The transcripts shall be made available in a place readily accessible to the public, and copies shall be furnished to any person at the actual cost of duplication. Id.
 
 
 64
 If in the future the Commission wishes to close all or any portion of a budget meeting, the statute requires it to announce its intention and to give a brief statement of its reasons. If any person objects to closing of the meeting, he may file a civil action in the District Court to compel the Commission to comply with the statute. He may include an application for interlocutory relief in his complaint, if the meeting has not yet been held. The District Court should act promptly on any motion for interim relief to avoid frustration of the purposes of the Sunshine Act through delay.[53] In its decision on the merits the District Court may examine in camera the transcripts of closed agency meetings and may issue such relief as it deems appropriate, with due regard for orderly administration and the public interest. Id. § 552b(h)(1).
 
 IV. CONCLUSION
 
 65
 For the reasons stated in this opinion the District Court's injunction issued July 2, 1981 and its contempt finding made on September 9, 1981 are vacated. Because the Commission has not carried its burden of proving that the July 27, 1981 and October 15, 1981 meetings were lawfully closed, the Commission shall release the transcripts of those meetings to the public forthwith.
 
 
 66
 So ordered.
 
 
 
 [1]
 See H.R.Rep.No. 94-880 (part 1), 94th Cong., 2d Sess. 2 (1976); S.Rep.No. 94-354, 94th Cong., 1st Sess. 19 (1975), U.S.Code Cong. & Admin.News 1976, p. 2183
 
 
 [2]
 See, e.g., 45 Fed.Reg. 47816 (1980), reprinted at Joint Appendix (JA) 9 (announcing open meeting on July 18, 1980 for fiscal year 1982 budget review)
 
 
 [3]
 The Commission unanimously voted to allow two members of the public, including the Girls' Nation delegate who had been selected as the chairman of the Girls' Nation Nuclear Regulatory Commission, to attend the closed meeting
 
 
 [4]
 The transcript of the July 18, 1980 meeting appears at JA 17-68
 
 
 [5]
 The Sunshine Act gives federal district courts the authority, "having due regard for orderly administration and the public interest, as well as the interests of the parties," to "grant such equitable relief as (they) deem ( ) appropriate, including granting an injunction against future violations of this section * * *." 5 U.S.C. § 552b(h)(1) (1976)
 
 
 [6]
 The Commission released the transcript of the July 18, 1980 meeting on February 27, 1981, after the President had transmitted his budget to Congress. Nevertheless the case did not become moot because the dispute was "capable of repetition, yet evading review(.)" Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911)
 
 
 [7]
 The Commission noted an appeal from this order on August 28, 1981, after the District Court ordered it to release the transcript of the July 25, 1981 meeting
 
 
 [8]
 Preliminary staff budget briefings on July 20, 21, 22, and 23, 1981 were held in open session
 
 
 [9]
 Common Cause attached to its motion a copy of the Commission's letter of July 17, 1981, which explained the Commission's position that budget meetings could be divided into two categories. JA 81-82
 
 
 [10]
 Exemption 2 applies to information that "relate(s) solely to the internal personnel rules and practices of an agency(.)" 5 U.S.C. § 552b(c)(2) (1976). Exemption 6 protects "information of a personal nature where disclosure would constitute a clearly unwarranted invasion of personal privacy (.)" Id. § 552b(c)(6). Exemption 10 shields discussions that "specifically concern an agency's issuance of a subpena," or its participation in a civil proceeding or arbitration, or its conduct of formal agency proceedings. Id. § 552b(c)(10)
 
 
 [11]
 All meetings "of a similar nature" to the July 18, 1980 Commission meeting might be construed to refer to all future preliminary staff budget review meetings, all future meetings to discuss the fiscal year 1982 budget, all future meetings to discuss budget proposals prior to the Commission's initial submission to OMB, or all future meetings to discuss budget figures for any fiscal year, before or after the agency's submission to OMB. The language of the order also leaves unclear the applicability of Exemption 9(B) and other Sunshine Act exemptions. On its face the order does not permit the Commission to close any portion of any "similar" meeting on the basis of any claimed exemption, but Common Cause contends that the District Court intended to permit the Commission to claim any exemption other than 9(B). Brief for appellees at 38
 A number of judicial decisions have struck down injunctions which similarly failed to describe the prohibited conduct with sufficient clarity or detail. See, e.g., Schmidt v. Lessard, 414 U.S. 473, 476, 94 S.Ct. 713, 715, 38 L.Ed.2d 661 (1974) (defendants ordered not to enforce "the present Wisconsin scheme" against those in appellee's class); SEC v. Savoy Industries, Inc., 665 F.2d 1310, 1318-19 (D.C.Cir.1981) (defendant ordered not to engage in any act or practice which "operates or would operate as a fraud or deceit upon any person"); NLRB v. Teamsters, 419 F.2d 1282, 1283 (6th Cir. 1970) (defendants ordered to cease from restraining or coercing the employees of a specified company "or the employees of any other employer within its jurisdictional territory"); E. W. Bliss Co. v. Struthers-Dunn, Inc., 408 F.2d 1108, 1116 (8th Cir. 1969) (defendant ordered not to deal with customers "for any other machines to which such control systems and/or components are applicable"); United States v. Vitasafe Corp., 345 F.2d 864, 871 (3d Cir.), cert. denied, 382 U.S. 918, 86 S.Ct. 290, 15 L.Ed.2d 232 (1965) (defendants ordered not to distribute literature which contains certain specified statements and misrepresentations "or which is otherwise false and misleading"); Brumby Metals, Inc. v. Bargen, 275 F.2d 46, 49 (7th Cir. 1960) (injunction forbidding sale of furniture incorporating plaintiff's design "or any variation thereof").
 
 
 [12]
 In addition, the injunction of July 2, 1981 was overly broad because it ordered the Commission to open all meetings "of a similar nature" without allowing for the possible applicability of specific exemptions to the Sunshine Act. It therefore exceeded the District Court's statutory authority to grant injunctions "against future violations of this section * * *." 5 U.S.C. § 552b(h)(1) (1976)
 
 
 [13]
 Even if an injunction complies with Rule 65(d), the petitioner in a civil contempt case has a heavy burden of proof, often described as proof by "clear and convincing evidence," that the respondent violated the court's prior order. Washington-Baltimore Newspaper Guild, Local 35 v. Washington Post Co., 626 F.2d 1029, 1031 (D.C.Cir.1980) (affirming District Court's denial of petition to find respondent in civil contempt)
 
 
 [14]
 Government in the Sunshine Act, ch. 409, 90 Stat. 1241 (1976) (declaration of policy). The section also states, "It is the purpose of this Act to provide the public with such information while protecting the rights of individuals and the ability of the Government to carry out its responsibilities." Id
 
 
 [15]
 The Commission's brief refers generally to "budget deliberations" and to the need for confidentiality in preparing budget proposals for consideration by the President. See brief for appellants at 16-26. Therefore we assume that the Commission contends that the Sunshine Act exempts preliminary staff budget review sessions as well as markup/reclama meetings and meetings to prepare reclama to OMB, even though the Commission's contentions with regard to release of the July 18, 1980 preliminary staff budget review transcript have become moot. See id. at 9; note 6 supra
 
 
 [16]
 S.Rep.No. 94-354, supra note 1, at 1, 4-5; H.R.Rep.No. 94-880 (part 1), supra note 1, at 2; Government in the Sunshine Act-S.5 (Public Law 94-409), Source Book: Legislative History, Texts, and Other Documents, Senate Committee on Government Operations and House Committee on Government Operations, 94th Cong., 2d Sess. 320-356 (1976) (Senate floor debate) (hereinafter cited as Source Book )
 
 
 [17]
 S.Rep.No. 94-354, supra note 1, at 1
 
 
 [18]
 5 U.S.C. § 552b(b) (1976) (general rule, subject to exceptions, that every portion of every meeting of an agency shall be open to public observation); see H.R.Rep.No.94-880 (part 1), supra note 1, at 3, 8; S.Rep.No.94-354, supra note 1, at 19, 20, 33 (presumption of openness). This court has previously recognized that the language of the Sunshine Act requiring open meetings is "sweeping, unqualified, and mandatory." Pacific Legal Foundation v. Council on Environmental Quality, 636 F.2d 1259, 1265 (D.C.Cir.1980). Exemptions must be narrowly construed, see text at note 33 infra, and even if an exception is applicable, the agency must nevertheless hold the meeting in open session if it finds that the public interest so requires. 5 U.S.C. § 552b(c) (1976)
 
 
 [19]
 5 U.S.C. § 552b(h)(1) (1976); H.R.Rep.No.94-880 (part 1), supra note 1, at 9; S.Rep.No.94-354, supra note 1, at 19, 33. With regard to the legality of the decision to close a meeting, the Act establishes a foreseeability standard. The agency must show that it was more likely than not that exempt matters would be discussed at the closed portion or portions of the meeting. S.Rep.No.94-1178, 94th Cong., 2d Sess. 15 (1976) (conference report); see S.Rep.No.94-354, supra note 1, at 10, 20 (absolute certainty not required). The test is different for a retrospective determination of whether the transcripts of a closed meeting should be released. The agency and reviewing court must base their decision on the discussions that actually did occur. If there was in fact no discussion of any exempt material, the entire transcript must be released; if exempt material was discussed, then the specific exempt portions may be deleted. 5 U.S.C. § 552b(f)(2) (1976)
 
 
 [20]
 5 U.S.C. § 552b(c) (1976) refers specifically to "any portion of an agency meeting" where the agency "properly determines that such portion or portions of its meeting or the disclosure of such information" is likely to fall within one of the ten specified exemptions. See note 46 infra (discussion of agency's authority to close portions of meetings)
 
 
 [21]
 See S.Rep.No. 94-354, supra note 1, at 3. Of the nine exemptions to the Freedom of Information Act, seven are included virtually verbatim in the Sunshine Act. The two omitted exemptions are Exemption 5 of FOIA, which allows agencies to withhold documents containing privileged material, including predecisional deliberations, and Exemption 9, which covers specified geological information
 
 
 [22]
 EPA v. Mink, 410 U.S. 73, 87, 93 S.Ct. 827, 836, 35 L.Ed.2d 119 (1973); Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 866-867 (D.C.Cir.1980); Vaughn v. Rosen, 523 F.2d 1136, 1146 (D.C.Cir.1975). Exemption 5 codifies the common law privilege for predecisional deliberations in order to protect open, frank written discussions between superiors and subordinates concerning administrative action
 
 
 [23]
 The Nuclear Regulatory Commission was one of the federal agencies which criticized the legislation during the committee stage because the bill did not provide any exemption for predecisional deliberations. William Anders, then chairman of the Commission, wrote to Representative Bella Abzug, chairman of the House subcommittee responsible for the Sunshine Act, urging that an exemption similar to FOIA's Exemption 5 should be included in order to protect preparation of budget requests and other matters. Government in the Sunshine Act: Hearings on H.R. 10315 and H.R. 9868 Before Subcommittee of the House Committee on Government Operations, 94th Cong., 1st Sess. 443, 445 (1975) (hereinafter cited as Government in the Sunshine Act: Hearings )
 The Federal Trade Commission also objected that the bill did not contain any clear exemption for internal budgetary planning information. Id. at 517, 523. The bill's omission of an exemption for predecisional discussions was criticized in letters to the House committee by the Federal Trade Commission, id. at 528, the Federal Communications Commission, id. at 388, the Federal Power Commission, id. at 504, and the Federal Home Loan Bank Board, id. at 554. Cf. Source Book, supra note 16, at 347 (remarks by Sen. Weicker) (public's right to know overrides agency arguments about free and open exchange of ideas behind closed doors).
 
 
 [24]
 The Senate Report explained that the Freedom of Information Act did not provide enough information to enable the public to "understand the reasons an agency has acted in a certain way, or even what exactly it has decided to do," because "(f)ormal statements in support of agency actions are frequently too brief, or too general, to fully explain the Commission's reasoning, or the compromises that were made." S.Rep.No.94-354, supra note 1, at 5. "By requiring important decisions to be made openly," the Senate committee added, "this bill will create better public understanding of agency decisions." Id
 A leading commentary on the Sunshine Act has recognized the "unavoidable tension between FOIA exemption (5), which recognizes a legitimate governmental interest in protecting the agency deliberative process as such," and the Sunshine Act, "which aims at maximum exposure of that process, at least at the collegial level." R. Berg & S. Klitzman, An Interpretive Guide to the Government in the Sunshine Act 98 (1978).
 
 
 [25]
 The conference committee used the language "determine or result in" the "joint conduct or disposition of agency business" rather than the more amorphous word "concern." This change appears to exclude "casual discussions between agency members * * *." See Source Book, supra note 16, at 818 (remarks by Rep. Fascell in House debate on conference report); R. Berg & S. Klitzman, supra note 24, at 4-11. Nevertheless, any discussions focused on concrete issues or proposals would fall within the Act's definition of a "meeting." See id. at 9. In this case the Commission does not contend that its deliberations on July 18, 1980, July 27, 1981, or October 15, 1981 did not constitute a "meeting" for Sunshine Act purposes
 
 
 [26]
 The conference report substantially adopted the language of the Senate bill for the definition of a "meeting." S.Rep.No.94-1178, supra note 19, at 11. The House report, like the Senate report, declared that meetings covered by the legislation "include not only sessions at which formal action is taken, but also those at which a quorum of members deliberates regarding the conduct or disposition of agency business." H.R.Rep.No.94-880 (part 1), supra note 1, at 3; see id. at 9, U.S.Code Cong. & Admin.News 1976, p. 2183
 Congress applied the principle of openness to the deliberations of multi-member agencies because it believed that the public should be able to observe the "give-and-take discussion between agency heads," each of whom had been selected by the President and confirmed by the Senate. "Their deliberative process can be appropriately exposed to public scrutiny in order to give citizens an awareness of the process and rationale of decisionmaking." S.Rep.No.94-354, supra note 1, at 17 (explaining application of Act to multi-member agencies and not to agencies and departments with single heads).
 
 
 [27]
 In the words of the Senate report, the budget "will be laid before Congress in the form of a proposed business program of government, already revised and coordinated in the interest of economy and efficiency and the reduction of taxation." S.Rep.No.524, 66th Cong., 2d Sess. 6 (1920)
 Typically each agency receives guidelines from the Director of OMB in the spring, setting out tentative overall budget ceilings. The agency allocates the tentative amount among its subdivisions and submits a budget request to OMB in September. OMB analyzes the agencies' requests, proposes changes, considers appeals from the agencies, and transmits a package to the President. After further analysis and discussion, which may include meetings between the President and agency heads, the President transmits his budget recommendations to the Congress in January for the following fiscal year. See Affidavit of Carey P. Modlin, OMB, filed on July 28, 1981 in Common Cause v. NRC, D.D.C. Civil Action No. 80-2347, JA 116-125.
 
 
 [28]
 31 U.S.C. § 16 refers to rules and regulations regarding OMB's preparation of the budget proposal; it is not clear to what extent it authorizes directives to agencies outside the Executive Office of the President
 
 
 [29]
 The government's brief cites OMB Circular A-10 (rev. ed. 1976), which instructs agencies to preserve confidentiality in their budget discussions. See text at note 30 infra
 
 
 [30]
 The directive adds that "premature disclosure of budgetary information" might be protected by Exemption 9(B) or other exemptions, and that agencies "will be held responsible for the propriety of determinations that would lead to the disclosure of this budgetary information." JA 130
 
 
 [31]
 Common Cause asserts that 22 out of 30 federal agencies which reported on budget meetings in their annual Sunshine Act reports in 1979 held budget meetings in open session. Brief for appellees at 22-23. Although these reports do not specify the substance and format of the budget meetings, they do suggest that a sizable number of federal agencies did not consider that their actions would be "significantly frustrated" by allowing the public to attend their budget meetings
 
 
 [32]
 Exemption 3 does not extend to matters on which the agency is authorized by other statutes to withhold material "on general discretionary grounds such as 'in the public interest' * * *." S.Rep.No.94-354, supra note 1, at 26; see S.Rep.No.94-1178, supra note 19, at 14 (conference report)
 
 
 [33]
 Source Book, supra note 16, at 817 (House debate on conference report)
 
 
 [34]
 When the Sunshine Act, already passed by the Senate, was under consideration in a subcommittee of the House Committee on Government Operations, the Nuclear Regulatory Commission wrote to the subcommittee chairman, Representative Abzug, to seek inclusion of an exemption for predecisional agency deliberations. Referring to the exemption which is now numbered 9(B), the Commission noted that its application to budget discussions and other matters "would require language-stretching most courts might find uncomfortable." Government in the Sunshine Act: Hearings, supra note 23, at 445
 
 
 [35]
 This was originally a separate subdivision of Exemption 9, see S.Rep.No.94-354, supra note 1, at 24-25, but it was deleted because the language of Exemption 9(B) was sufficient to cover the situation, see S.Rep.No.94-1178, supra note 19, at 15
 The Commission's brief also relies on a statement in floor debate by Senator Chiles, 121 Cong.Rec. 35331 (1976), see Source Book, supra note 16, at 346-347, that Exemption 9(B) would cover preparation by an agency of a response to a confidential request from Congress for information or opinions. Brief for appellants at 24-25. We discount the importance of this statement in interpreting Exemption 9(B) because, as the Supreme Court has recognized, "(t) he remarks of a single legislator, even the sponsor, are not controlling in analyzing legislative history." Chrysler Corp. v. Brown, 441 U.S. 281, 311, 99 S.Ct. 1705, 1722, 60 L.Ed.2d 208 (1979).
 
 
 [36]
 Modlin Affidavit, supra note 27, at 9, JA 124 ("the inherently political judgments expressed in the Budget on how the nation's fiscal resources should be allocated to meet its future economic and social needs"); see 10 C.F.R. § 9.104(b) (1981) (Nuclear Regulatory Commission regulations interpreting Exemption 9(B))
 
 
 [37]
 The Commission emphasizes that its funding request to the President is "not a final decision," "no more than its formal advice to the President for his consideration in determining what he will recommend to the Congress in his annual Budget * * *." Reply brief for appellants at 2 n.1. We think that if Congress had intended to include such advice within Exemption 9(B), it would have used language better tailored to the purpose than the words "significantly frustrate implementation of a proposed agency action." 5 U.S.C. § 552b(c)(9)(B) (1976) (emphasis added). It is significant to us that the language of the Sunshine Act's definition of a "meeting," applying to the joint conduct or determination of official agency business, is considerably broader than the language of Exemption 9(B)
 
 
 [38]
 These well-known methods have been analyzed by many scholarly commentators and journalists. See, e.g., A. Wildavsky, The Politics of the Budgetary Process (3d ed. 1979). Given the familiarity of these techniques, it is not clear how much benefit the Commission derives from closing its budget meetings
 
 
 [39]
 According to the Commission, "(T)here can be no greater frustration to an agency than to be unable to operate specific programs or activities because of lack of funds and personnel." Reply brief for appellants at 5-6. The Commission uses the term "frustration" out of context. Even under this line of reasoning, moreover, the Commission's argument may be questionable. Our interpretation of the Sunshine Act applies to the budget meetings of all agencies, including those with which the Commission is competing for available funds. The Commission would not therefore be in a worse competitive position under a general regime of open budget meetings than it would be under a general regime of closed budget meetings, unless its budget figures were more susceptible to obfuscation
 
 
 [40]
 Congress intended to limit closings under Exemption 9(B) to situations in which disclosure "would have a considerable adverse effect." H.R.Rep.No.94-880 (part 1), supra note 1, at 12, U.S.Code Cong. & Admin.News 1976, p. 2194. But the Commission has failed to demonstrate such an effect. It is arguable that the public interest would be served if OMB made budget decisions on the basis of full disclosure from agencies and departments, although we need not decide this question here. Congress, by passing the Sunshine Act and limiting the exceptions narrowly, has made its own determination of where the public interest lies
 
 
 [41]
 To determine whether frustration of agency action would be "significant" or "serious," Congress suggested a balancing test "to determine how the public interest is best served." S.Rep.No.94-354, supra note 1, at 25; H.R.Rep.No.94-880 (part 1), supra note 1, at 12
 
 
 [42]
 The Sunshine Act does not, however, prevent agencies from making decisions by sequential, notational voting rather than by gathering at a meeting for deliberation and decision. See Communications Systems, Inc. v. FCC, 595 F.2d 797, 799-800 (D.C.Cir.1978); S.Rep.No. 94-1178, supra note 19, at 11 (conference report). Therefore, an agency might make its budget decisions by circulating staff memoranda and voting by notation; these documents might be protected under Exemption 5 of FOIA. If the agency holds a meeting, however, the Sunshine Act requires the meeting to be in open session. If there is an anomaly here, it was created by the choice of Congress
 
 
 [43]
 "The President * * * may require the Opinion, in writing, of the Principal Officer in each of the executive Departments, upon any subject relating to the Duties of their respective Offices * * *." U.S.Const., Art. II, § 2, cl. 1
 
 
 [44]
 The government cites several decisions suggesting that congressional interference with giving advice to the President might violate the separation of powers by impairing the "advice and opinion" function. Each of these cases avoided the constitutional issue by statutory construction or other means, and none of them dealt with the situation in this case-the application of the Sunshine Act to an independent regulatory agency. See Pacific Legal Foundation v. Council on Environmental Quality, supra note 18, 636 F.2d at 1265 (application of Sunshine Act to agency within Executive Office of the President); Sierra Club v. Andrus, 581 F.2d 895, 905 (D.C.Cir.1978), rev'd on other grounds, 442 U.S. 347, 99 S.Ct. 2335, 60 L.Ed.2d 943 (1979) (application of National Environmental Policy Act to Interior Department's budget requests); State of Alaska v. Carter, 462 F.Supp. 1155, 1160 (D.Alaska 1978) (application of NEPA to Interior Secretary's advice to President); Nader v. Baroody, 396 F.Supp. 1231, 1234 & n.5 (D.D.C.1975) (application of open meetings requirements of Federal Advisory Committee Act to informal biweekly meetings between Executive officials and private sector groups). They provide little assistance in resolving the separation of powers issue raised by the Commission in this case
 
 
 [45]
 See note 30 supra and accompanying text (OMB Circular A-10 recognizes applicability of Sunshine Act to budget meetings)
 
 
 [46]
 Even if a portion of a budget meeting may lawfully be closed because that part of the discussion is protected by a specific exemption, the Commission may not close the entire meeting. S.Rep.No. 94-1178, supra note 19, at 17 (conference report); see R. Berg & S. Klitzman, supra note 24, at 30. Congress declared that meetings should be opened to the fullest extent possible. See S.Rep.No. 94-354, supra note 1, at 11. We therefore reject the Commission's contention that the Sunshine Act does not require an agency to segregate exempt discussions into a closed portion of its meeting. Memorandum for Appellants in No. 81-2147 at 25 n.22. When the Commission expects that exempt subject matter will arise at a budget meeting, it should make reasonable efforts to arrange its agenda so that these matters will not be interspersed with non-exempt portions of the discussion. If segregation of exempt and non-exempt material would make a coherent discussion impossible, then it may be reasonable to close the entire meeting. See, e.g., A. G. Becker Inc. v. Board of Governors of Federal Reserve System, 502 F.Supp. 378, 387 (D.D.C.1980). However, in this case the agency's contentions regarding the impracticality of segregating exempt and non-exempt material appear to rest on overly broad readings of Exemptions 2, 6, and 9(B)
 Once a meeting has been held behind closed doors, the agency must review the transcript and release any portions which are not exempt under specific provisions of the Sunshine Act. 5 U.S.C. § 552b(f)(2) (1976). The Commission contends that the Sunshine Act's provision requiring release of transcripts does not incorporate the "reasonably segregable" test of FOIA. Memorandum for Appellants in No. 81-2147 at 28-29 n.23. We need not reach this issue because, in this case, we find that no part of either transcript may be withheld from the public.
 
 
 [47]
 Allocation of personnel cutbacks among subdivisions of the agency would come within Exemption 9(B) only if they are actually expected to be the subjects of collective bargaining negotiations. But see 5 U.S.C. § 7106(a)(1) (Supp. IV 1980) (nothing in collective bargaining legislation for federal employees "shall affect the authority of any management official of any agency-(1) to determine the mission, budget, organization, number of employees, and internal security practices of the agency")
 
 
 [48]
 In Rose the Court held that Exemption 2 did not authorize the Air Force Academy to withhold summaries of Honor Board hearings dealing with alleged violations of the Honor Code for cadets, from which names were deleted if a guilty verdict had been reached. The Court found that, given the importance of military discipline to the effectiveness of the armed forces and their relations with civilian authorities, the Honor Board summaries contained matters subject to a "genuine and significant public interest." 425 U.S. at 369, 96 S.Ct. at 1603
 
 
 [49]
 We need not decide whether the exemptions to the two acts are identical in all circumstances, a question that has been left unsettled by this court. Compare Crooker v. Bureau of Alcohol, Tobacco & Firearms, 670 F.2d 1051, 1062 n.30 (D.C.Cir.1981) (en banc) (Sunshine Act is "an entirely different act"); id., 670 F.2d at 1080-1081 (MacKinnon, J., concurring) (legislative history of two acts "not contradictory"); id., 670 F.2d at 1052 n.1 (Mikva, J., concurring) ("legislation whose application is invoked in entirely different contexts"); id., 670 F.2d at 1108 n.70 (Wilkey, J., dissenting) (two statutes have "same basic purpose" and "close similarity," and Sunshine Act is "modeled" after FOIA)
 
 
 [50]
 During the legislative consideration of the Sunshine Act the Commission acknowledged to the House subcommittee chairman that Exemption 2 was likely to be construed so narrowly that it would not cover budget discussions and other similar matters that the Commission wished to exempt. Government in the Sunshine Act: Hearings, supra note 23, at 445
 
 
 [51]
 Disclosure under these circumstances would serve the general purposes of the Sunshine Act. "(W)here the government is not functioning as well as it could," the Senate report explained, "public exposure should help insure that the quality of work remains at the highest possible level." S.Rep.No. 94-354, supra note 1, at 5
 
 
 [52]
 The Commission also claimed that Exemption 10 justified closing its October 15, 1981 meeting. The exemption applies to discussions that "specifically concern the agency's issuance of a subpena, or the agency's participation in a civil action or proceeding, an action in a foreign court or international tribunal, or an arbitration, or the initiation, conduct, or disposition by the agency of a particular case of formal agency adjudication pursuant to the procedures in section 554 of this title or otherwise involving a determination on the record after opportunity for a hearing." 5 U.S.C. § 552b(c)(10) (1976). We need not reach this issue because the government no longer claims that Exemption 10 is applicable to the closed discussions
 
 
 [53]
 The statute requires the government defendant to file its answer within 20 days of the service of the complaint. Ordinarily the United States or an officer or agency thereof is accorded 60 days to answer a complaint. See Fed.R.Civ.P. 12(a). The Sunshine Act, however, establishes an expedited process because Congress recognized that "(i)t is important that actions brought under this subsection be handled expeditiously in order for public participation to be meaningful." S.Rep.No.94-354, supra note 1, at 33