**PUBLIC CITIZEN, The Bureau of National Affairs, The Washington Post, The Wall Street Journal, and Stephen Wildstrom, Plaintiffs,**

v.

**The NATIONAL ECONOMIC COMMISSION and Administrator of the General Services Administration, Defendants.**

Civ. A. No. 88–3484.

United States District Court, District of Columbia.

Jan. 5, 1989.

Alan B. Morrison, Eric R. Glitzenstein, Eleanor H. Smith, Public Citizen Litigation Group, Washington, D.C., for plaintiffs.

Charles F. Flynn, Asst. U.S. Atty., Washington, D.C., for defendants.

MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

On December 9, 1988, this Court issued a memorandum opinion granting plaintiffs' motion for a temporary restraining order which prohibited defendants from closing to the public the proposed December 12, 1988 meeting of the National Economic Commission ("Commission"), at which it intended to discuss economic assumptions and budget options. Thereafter, the December 12 meeting was rescheduled to Jan-

uary 4, 1989. On December 12, 1988, plaintiffs filed an amended complaint and motion for a preliminary or permanent injunction, seeking to prevent defendants from closing to the public the January 4 meeting as well as certain subsequent meetings under the Federal Advisory Committee Act ("FACA"), 5 U.S.C.App. II (1972), as amended.[1] On December 16, 1988, defendants filed a motion for summary judgment, asserting that the January 4 meeting and the subsequent meetings could be lawfully closed under exemption 9(B) of the Government in the Sunshine Act ("Sunshine Act"), 5 U.S.C. § 552b(c)(9).[2] Defendants advised the Court by a memorandum filed on December 23, 1988 that the January 4, 1989 meeting had been rescheduled once again for January 10, 1989.[3]

Having carefully considered plaintiffs' motion, defendants' motion, and the entire record, the Court grants plaintiffs' motion for a permanent injunction and denies defendants' motion for summary judgment.

## I. BACKGROUND

The relevant facts up until this stage of the litigation have been adequately set out in this Court's Memorandum Opinion of December 9, 1988 and need not be repeated here. The January 10, 1989 meeting, which has been twice re-scheduled from its original date of December 12, 1988, is the first of twelve meetings that have been scheduled by the Commission. The subject matter of the January 10, 1989 meeting has not changed. Two issues are to be discussed: (1) "economic assumptions", i.e., projections of growth, inflation, interest rates, and unemployment, and (2) "budget options", i.e., spending cuts or revenue measures. Senior economists from the Office of Management and Budget ("OMB") and the Congressional Budget Office ("CBO") plan to answer questions and give testimony before the Commission.

The agenda for the remaining meetings of the Commission is set forth in a memorandum to the members of the Commission dated October 12, 1988. First Mathiasen Declaration, ¶ 4; Def. Ex. B.[4] Originally, meetings were scheduled to take place between November 18 and December 16, 1988. On October 13, 1988, Drew Lewis and Robert Strauss, Co-Chairmen of the Commission, wrote to Richard G. Austin, Acting Administrator of the General Services Administration, requesting a written determination that eleven meetings be closed (some meetings in whole, some in part) under 5 U.S.C. § 10(b), (c)(2) [sic]. Def.Ex. C. They enclosed a draft determination for Austin to consider. By letter dated October 24, 1988, Lewis and Strauss again wrote to Austin, supplementing their October 13, 1988 letter. Def.Ex. D. On October 26, 1988, Lewis and Strauss wrote yet again to Austin, supplementing their previous letters. Def.Ex. E. On November 3, 1988, the Administrator issued his determination, closing eleven meetings of the Commission to be held between November 28 and December 16 under exemption 9(B) of the Sunshine Act, 5 U.S.C. § 552b(c)(9). Def. Ex. F.[5] Because the

1. Although initially plaintiffs sought only a temporary restraining order, plaintiffs represented at the hearing on their motion for a temporary restraining order on December 7, 1988, that they intended to amend their complaint to seek further relief. The Court, in its December 9 order, directed plaintiffs, if they so desired, to file an amended complaint and motion for preliminary injunction on or before December 12, 1988.

2. The memorandum of points and authorities in support of defendants' motion for summary judgment also serves as an opposition to plaintiffs' motion for a preliminary and permanent injunction. The parties agree that this matter is ripe for decision on the merits. Accordingly, the Court shall treat plaintiffs' motion as a motion for permanent injunctive relief and resolution of both motions will dispose of this case.

3. The parties' briefs address the January 4, 1989 meeting. Since the content of the January 10 meeting has not changed, the Court will consider the arguments made by the parties in their briefs as if made in reference to the January 10, 1989 meeting.

4. All defense exhibits referred to herein are attached to defendants' Memorandum in Opposition to [Plaintiffs'] Motion for a Temporary Restraining Order.

5. The November 3, 1988 determination covered one meeting on December 5, 1988, to occur between 1:30 and 2:30 p.m., which was not in

Commission later decided not to hold itself to a self-imposed December 21 deadline for issuance of its recommendations, the closed meetings listed in that memorandum were not held. First Mathiasen Declaration, ¶ 7. The Commission has not held any of these meetings as of this date.

Defendants state in their Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for a Preliminary Injunction ("Def. Memo.") that "plaintiffs are correct in assuming ... that the topics of the closed meetings will closely follow those announced in October: 'economic assumptions and treatment of social security', 'alternative baseline concepts', 'fiscal policy and deficit targets', 'components of deficit reduction package', 'spending programs', 'deficit reduction options', and 'deficit reduction options and enforcement.'" Def. Memo., at 5. The eleven meetings listed in the November 3, 1988 determination of the Acting Administrator and described in the October 12, 1988 memorandum are the meetings with which the Court is presently concerned. Plaintiffs now seek a permanent injunction preventing defendants from closing to the public these meetings as well as any other meetings in which the Commission intends to address these issues.[6]

## II. ANALYSIS

 The issue before the Court is virtually identical to the issue that existed on plaintiffs' motion for a temporary restraining order: Does exemption 9(B) of the Sunshine Act apply to meetings of the National Economic Commission where the above topics are to be addressed?[7] Defendants vehemently argue that this question must be answered in the affirmative. In support of their position, defendants offer the same arguments previously raised in their opposition to plaintiffs' motion for a temporary restraining order. They sum up their concerns at page 11 of their memorandum.

In particular, the Commission's concerns break down into two interrelated categories: first, the likely ramifications of public testimony by the senior economists from the Office of Management and Budget and the Congressional Budget Office, and second, the likely consequences of public examination of the internal debate by the Commission members themselves.

Def.Memo., at 11.

Defendants also continue to express their previously stated concerns that the senior economists from OMB and CBO will not be candid in public testimony before the Commission and that the Commission members themselves will be inhibited in publicly questioning these witnesses. Defendants state:

> [T]he Commission faces the dual problem of encouraging the *witnesses* to be frank and open in their testimony and allowing the *Commission members themselves* to be unreserved in questioning the witnesses.

Def.Memo., at 12 (emphasis in original).

In an attempt to bolster their position, defendants attach three new declarations

the original request from the Commission. The Administrator also approved the closure of the November 18, 1988 meeting pursuant to exemption 2, rather than exemption 9, a change of exemption requested by the Commission in its October 26, 1988 letter. Exhibit E. Plaintiffs do not challenge the closure pursuant to exemption 2. Plaintiff's Memo. in Support, at 5, n. 6.

6. Only the first of the meetings which the Commission intends to close has been rescheduled. The remainder of the revised schedule is to be announced shortly. Def. Memo., at 5. In determining whether these meetings can be properly closed under exemption 9(B), the Court is, of course, concerned with the content of these meetings, rather than the day on which they are held.

7. It is undisputed that the Commission is subject to the open meeting requirement of FACA, 5 U.S.C. App. II, § 10(a)(1), (d) and cannot close its meetings to the public unless one of the ten exemptions to the Sunshine Act applies. Exemption 9(B), the sole exemption invoked by defendants, allows closure of a meeting where the agency properly determines that such portion or portions of its meeting or the disclosure of such information is likely to

(9) disclose information the premature disclosure of which would—

(B) in the case of any agency, be likely to significantly frustrate implementation of a proposed agency action.

to their memorandum. However, these declarations add little, if anything, to the arguments previously raised and rejected by this Court. In the first of the three declarations, Co–Chairman Drew Lewis states two major reasons that some meetings of the Commission should be closed to the public.

First, public officials, if they are responsible, must be circumspect in their public comments. Market reactions to incorrectly reported and/or misunderstood statements or statements taken out of context by senior government officials are facts of life. The risk is greater when the statements are made by persons who are perceived to be decision makers, close to decision makers, or parts of small groups making a decision . . .

In this respect this Commission is precisely like a committee of Congress with jurisdiction in a particular area. Although the members often have public positions, at some point the members have an opportunity to speak bluntly with one another without public observation, as they try to reach a compromise. . . . [The Commission] will not succeed if members of the Commission must work under the dual concern of either maintaining their public stances and or fearing that their statements, and even their short term disagreements, will lead to damaging financial speculation both here and abroad.

Second, for some elements of the Commission's work such as economic assumptions, the nature of the information we receive from an outside source can be, from my experience, markedly different if the meeting is public rather than private. . . .

Any realistic policy maker understands that the questions that can be asked of a witness, such as the officials of the Office of Management and Budget and Congressional Budget Office whom we would like to bring before the Commission in closed session, are markedly different if the questioning is in public rather than private. Likewise, the answers that can be expected of such witnesses will be significantly different.

Holding all of the Commission's working sessions in public will alter the outcome of the Commission's work because of the conscientious efforts of each Commissioner to avoid discussion, comments or even confrontation, that could result in unwarranted speculation in the financial markets. Experienced public officials know that their public statements must be undertaken with care, be they to the press, in speeches or in television or radio interviews. . . . I can only state from my experience that the Commission must have an opportunity to work out its differences in private if it is to most effectively execute the mandate entrusted to it by Congress.

Lewis Decl., ¶ 6. In the second declaration, Co–Chairman Robert Strauss explains why the internal debate must be protected from public scrutiny until the final recommendations are made. He states that

The recommendations of this Commission will inevitably have an effect upon financial markets both here and abroad. However, it will be less disruptive to these markets if there is only one response to a completed set of recommendations, rather than repeated effects from partial reports which would occur if every aspect of the Commission's work is commented on before it is completed.

Strauss Decl., ¶ 7. He goes on to state that

My fellow Commissioners are all public figures many of whose views on the Federal budget deficit and related issues are matters of public record. Unfortunately, the historic views of many of the Commissioners are significantly at odds with each other. . . . What this Commission must do is take these divisions and through hard bargaining, reach a compromise. To believe that this process will work as well in public goes against common sense and against my entire life's experience in government. Indeed, the true question is whether the process, under these constraints, will work at all.

*Id.* ¶ 9. The third new declaration is the second declaration of David Mathiasen, which merely relies on declarations of Lewis and Strauss for the blanket assertion that "the agenda items for the upcoming Commission meetings are subjects appropriately considered in closed session ..." Second Mathiasen Decl., ¶ 4.

These declarations present no new arguments, nor any basis for diverging from this Court's conclusion in its December 9 memorandum opinion that defendants have failed to establish that opening the meetings will "significantly frustrate implementation of a proposed agency action" under exemption 9(B) of the Sunshine Act. They merely repeat, through different affiants, the same concerns which Mathiasen raised in his original declaration and which this Court specifically rejected in its December 9 opinion.

Defendants persist in arguing that their internal debate should be closed to the public because it would create market speculation which would "significantly frustrate" the Commission's mandate. This contention was specifically addressed and rejected in the December 9, 1988 memorandum opinion. Defendants' argument seems all the more disingenuous at this moment given the fact that the Commission's Co–Chairmen, Robert Strauss and Drew Lewis, appeared on national television on December 11, 1988 and spoke about the very issues which the Commission plans to debate and which they wish to prevent the public from seeing and hearing. On NBC News' Sunday morning program "Meet the Press", Strauss and Lewis discussed various budget options that the Commission is considering. Lewis stated that the Commission is going in the direction of addressing the deficit through reductions in spending. *See* Transcript of NBC News "Meet the Press", Plaintiff's Memo. in Support, Exhibit 1, p. 2. Strauss, on the other hand, stated that in his judgment, there are not sufficient spending cuts to make up the shortfall. *Id.* at 4. They discussed the possibility of gasoline and broad base energy taxes as well as a means tested consumption tax. *Id.* at 7. Defendants fail to explain why these comments by the Co–

Chairmen will not cause market speculation and instability similar to that they fear will be engendered by opening the Commission's meetings to the public.

The Court's analysis in its December 9 opinion as to defendants' other arguments is equally applicable to the instant motion for a permanent injunction. That opinion is incorporated herein by reference and attached hereto, with its accompanying order, for convenience. The reasoning of *Common Cause v. Nuclear Regulatory Commission*, 674 F.2d 921 (D.C.Cir.1982) continues to control the instant case. A close scrutiny of defendants' arguments reinforces the view that defendants continue to seek the broad deliberative process privilege which *Common Cause* specifically prohibits.

In *Common Cause*, the Nuclear Regulatory Commission sought to close a series of meetings to discuss preparation of the agency's annual budget request for fiscal year 1982, invoking exemption 9(B) of the Sunshine Act. The Court concluded that "there is no blanket exemption for agency meetings at any stage of the budget preparation process. The availability of exemptions for specific portions of budgetary discussions must be determined upon the facts of each case." 674 F.2d at 923. The Court recognized that "specific items discussed at Commission budget meetings *might* be exempt from the open-meeting requirement of the Act, and *might* justify closing portions of the Commission meetings ..." *Id.* at 936 (emphasis added). However, *Common Cause* made it clear beyond any doubt that this could only be done "on an individual and particularized basis." *Id.* at 936. Furthermore, the burden is on the party seeking to close the meeting to establish that the invoked exemption properly applies. *Id.* at 929.

Defendants in the instant case are not seeking to close *specific portions* of the scheduled meetings on an "individual and particularized" basis. On the contrary, defendants wish to shield the internal debate from the public by closing, *in their entirety, all working sessions* of the Commission. They have not carried their burden

of establishing that exemption 9(B) applies to all of the scheduled meetings of the Commission.

The only meetings the Commission has opened to the public are preliminary hearings, a meeting at which the Commissioners introduced themselves, four staff presentations, and one meeting of a panel of experts. Defendants' position can only be characterized as an extreme and inflexible attempt to invoke a blanket exemption, thereby screening its deliberative processes from public scrutiny. That defendants are asserting such a broad privilege is demonstrated by defense counsel's responses to questions propounded by the Court at December 7, 1988 hearing on plaintiffs' motion for a temporary restraining order. When the Court asked defense counsel for examples of the kind of Commission discussions which could be open to the public, the sole example given was testimony concerning the economic history of the country. *See* Transcript of proceedings of December 7, 1988 ("Tr."), pp. 13–14, 26–28. As to discussions concerning the present state of the economy or projections about its future course, the sense of defendants' argument was that all such discussions should be closed.

A glance at the Commission's proposed work agenda demonstrates that defendants have not described with any specificity or particularity the content of the meetings it wishes to close. For example, the schedule describes the content of the closed portion of the November 28, 1988 meeting, entitled Economic Assumptions, as "Working session on economic assumptions and treatment of social security." Def.Ex. B, at 2. The closed portion of the November 29, 1988 meeting entitled Alternative Baselines is described as "Working session on alternative baseline concepts." *Id.* Like descriptions exist for the meetings scheduled for November 30, December 1, December 2, December 5, December 6, and December 7. The description of the closed portions of the meetings, vague at best, does little, if anything, to enable this Court to determine, "upon the facts of each case," as *Common Cause* requires, whether exemption 9(B) is properly invoked by defendants.

*Common Cause* as well as the legislative history of the Sunshine Act make it evident that there is a presumption of openness for the Commission's meetings which can only be overcome if one of the ten narrowly-construed exemptions of the Sunshine Act applies. Defendants' approach, by contrast, appears to be a presumption of closure, rather than openness. Such an approach is impermissible. That defendants are operating under a presumption of closure is supported by the Co–Chairmen's October 13, 1988 letter to Richard Austin, Acting Administrator of the General Services Administration, requesting the closure of several meetings,[8] as well as the Administrator's November 3, 1988 determination that certain meetings of the Commission could be closed.[9] Although the fall agenda shows that closed meetings were scheduled for certain specific hours, the Co–Chairmen requested and the Administrator determined that the meetings were properly closed for time periods in excess of that set out in the Commission's written agenda. For instance, the fall schedule states that at the November 29, 1988 meeting, the working session from 1:00 PM until 5:30 PM will be closed. However, the Co–Chairmen requested and the Administrator determined that the November 29 meeting should be closed from *11:00 AM* until 5:30 PM, two additional hours. The Court is unable to discern whether any discussion is planned for those two additional hours. If a discussion is planned, defendants have failed to explain why there is no description of the discussion in the agenda. If no discussion is planned, defendants have failed to explain why the additional two hours have been designated on the Administrator's determination as properly closed. Similar discrepancies are present for the meetings scheduled for November 28, November 30, December 1, and December 2. Although not determinative of the ultimate issue in this case (whether

8. Def.Ex. C.

9. Def.Ex. F.

exemption 9(B) applies to the Commission's proposed meetings), this propensity to closure is indicative of defendants' overall posture in this case and supports the conclusion that defendants are asserting the broad deliberative process privilege which *Common Cause* specifically and unequivocally rejected.

Congress specifically made the Commission subject to FACA, which incorporates the ten exceptions of the Sunshine Act to the open meeting requirement of Section 10(a)(1) of FACA. Plaintiffs represented at the December 7, 1988 hearing on their motion for a temporary restraining order that they could envision *no* instance in which the Commission could properly close its meetings. Tr., at 8. Defendants maintain that this extreme position reads the ten exceptions of the Sunshine Act out of the law completely. The Court agrees with defendants that closing particularized portions of Commission meetings for discussions of specific items might be appropriate on an individualized basis and the Court's opinion therefore must not be read as holding that all meetings of the Commission, of whatever nature, must always be open to the public and that exemption 9(B) can never apply. But, the burden remains upon the *defendants* to establish the applicability of the narrowly construed exemption from the open meeting requirement of FACA, by demonstrating specifically the individualized and particularized basis on which they seek closure from the public. Defendants, in this case, have failed to make the showing which satisfies this burden.

Congress, a deliberative body of renown, and not a stranger to some closed meetings, could have—had it so elected—exempted the National Economic Commission, with its important, far-reaching mandate, from the enveloping strictures of FACA. It did not do so. Indeed, fully recognizing that the Commission's composition would be prestigious and its activities significant to the national need and the international community, Congress made a deliberate choice to make this Commission subject to the open meeting requirements of FACA.

## III. CONCLUSION

Defendants have failed to carry their burden of demonstrating that exemption 9(B) of the Sunshine Act applies to the proposed meetings of the National Economic Commission. Rather than singling out discrete portions of some meetings on an individual and particularized basis with justification for such limited closure, defendants assert a sweeping and broad deliberative process privilege, shielding their internal debate and operation from the public. The legislative history of the Sunshine Act as well as the relevant case law prohibits this. Based on the record herein, defendants have not demonstrated their entitlement to close the January 10, 1989 meeting of the Commission or any subsequent meetings at which they will discuss the issues set forth in their agenda.

The Court is fully aware that it may well be easier to work without public scrutiny and may even facilitate eventual determinations and recommendations by the Commission. But facilitation is not the issue here. The issue is whether opening these Commission meetings to the public would "significantly frustrate the implementation of a proposed agency action." This defendants have failed to demonstrate.

Accordingly, plaintiffs' motion for a permanent injunction is granted. Defendants' motion for summary judgment is denied for the reasons stated above.

Although this case will stand dismissed by the accompanying order, plaintiffs, in their amended complaint, have requested costs and reasonable attorneys' fees, a matter which can be, and customarily is, briefed subsequently. Briefing is deferred briefly to afford the parties an opportunity to resolve this issue amicably. If it remains for resolution, then the parties shall brief the issue with appropriate specificity, on the schedule set forth in the accompanying Order.

A separate Order accompanies this Memorandum.

IT IS SO ORDERED.

## ORDER

For the reason set forth in the Memorandum Opinion issued this date, it is hereby

DECLARED that the defendants' refusal to open to the public the meeting of the National Economic Commission (with its proposed agenda) rescheduled to January 10, 1989, and the other meetings enumerated in the November 3, 1988 determination by the Acting Administrator of the General Services Administration as properly closed under exemption 9(B), with their agenda for closure as proposed by the Commission and yet to be rescheduled, violate the Federal Advisory Committee Act, 5 U.S.C.App. II. It is

FURTHER ORDERED that defendants' motion for summary judgment is denied. It is

FURTHER ORDERED that plaintiffs' motion for a permanent injunction is granted. It is

FURTHER ORDERED that defendants National Economic Commission and Administrator of the General Services Administration are hereby restrained and enjoined from closing to the public the meeting scheduled for January 10, 1989 (or a meeting on any other date to which this agenda be rescheduled) to receive economic assumptions and assessments of senior officials of the Office of Management and Budget and the Congressional Budget Office on the present direction of the economy (including projections concerning future interest rates, unemployment, economic growth, and inflation) and the discussions and deliberations of the commissioner members of the National Economic Commission on budget options. It is

FURTHER ORDERED that defendants National Economic Commission and Administrator of the General Services Administration are hereby restrained and enjoined from closing to the public the meetings set forth in the Administrator's November 3, 1988 determination (Exhibit F of Defendant's Memorandum in Opposition to Plaintiffs' Motion for a Temporary Restraining Order) with the October 12, 1988 proposed agenda on whatever date to which they are rescheduled. Those meetings constitute:

| Original Date and Times | | | |
|---|---|---|---|
| November 28: | 11:00 AM – | 5:30 PM | Economic Assumptions |
| November 29: | 11:00 AM – | 5:30 PM | Alternative Baselines |
| November 30: | 11:00 AM – | 5:30 PM | Fiscal Policy and Deficit Targets |
| December 1: | 9:00 AM – | 5:30 PM | Components of Deficit Reduction Packages |
| December 2: | 12:00 PM – | 5:30 PM | Question and Answer Panel Session |
| December 5: | 9:00 AM – | 12:00 PM | Deficit Reduction Options |
| December 5: | 1:30 PM – | 2:30 PM | Deficit Reduction Options |
| December 6: | 9:00 AM – | 5:30 PM | Deficit Reduction Options and Enforcement |
| December 7: | 9:00 AM – | 5:30 PM | Deficit Reduction Options and Enforcement |
| December 12: | 10:30 AM – | 5:30 PM | Review Draft Document |
| December 16: | 9:00 AM – | 12:00 PM | Final Approval of Document |

It is FURTHER ORDERED that, in consideration of the immediacy of the matters hereby enjoined and for the reasons stated in the Memorandum Opinion for the grant of this injunction, there shall be no stay of this Order in the event defendants elect to note an appeal. It is

FURTHER ORDERED that this case stands dismissed. It is

FURTHER ORDERED that the plaintiffs shall file their application for counsel fees and costs on or before March 10, 1989; opposition shall be filed on or before March 30, 1989; reply, if any, on or before April 6, 1989. Should there be a timely appeal, then this separate order as to counsel fees and costs, shall be stayed in briefing and resolution until the United States Court of Appeals for the District of Columbia has issued its final ruling on the case.

### APPENDIX

### MEMORANDUM OPINION

#### [Dec. 9, 1988]

Plaintiffs Public Citizen, The Bureau of National Affairs ("BNA"), The Washington Post, The Wall Street Journal, and Stephen Wildstrom, senior editor for Business Week in Washington, D.C. seek to inform the public on issues affecting the national economy and how the government and its advisers are progressing in finding solutions to pressing economic problems, specifically, the Federal budget deficit. Plaintiffs filed a complaint for declaratory and injunctive relief on December 5, 1988. The matter is presently before the Court on plaintiffs' motion for a temporary restraining order to prohibit defendant National Economic Commission ("Commission") from closing to the public any portion of the meeting it has scheduled for December 12, 1988, at which it intends to discuss economic assumptions and review budget options pursuant to the Federal Advisory Committee Act ("FACA"), 5 U.S.C.App. II (1972), as amended,[1] and defendants' opposition thereto. The sole issue before the Court is whether exemption 9 of the Government in the Sunshine Act ("Sunshine Act"), 5 U.S. C. § 552b(c)(9), as amended, applies to the content of the December 12 meeting so that defendants can properly exclude the public from attending. For the reasons set forth below, plaintiffs' motion is granted.

### I. BACKGROUND

Among the most pressing problems currently facing this nation is the reduction of the soaring Federal budget deficit. Congress created the National Economic Commission, by section 2101 of Title II of the Omnibus Budget Reconciliation Act of 1987 ("Omnibus Act"), Pub.L. 100–203, to report to the President and Congress on ways to decrease the Federal budget deficit. The Commission consists of twelve members, including two United States Senators and two members of the United States House of Representatives.[2]

The mandate of the Commission is set forth at section 2103(a) of the enabling legislation, which requires that the Commission make specific recommendations regarding:

(1) Methods to reduce the Federal budget deficit while promoting economic growth and encouraging saving and capital formation.

(2) A means of ensuring that the burden of achieving the Federal budget deficit reduction goals of the United States does not undermine economic growth and is equitably distributed and not borne disproportionately by any one economic group, social group, region or State.

---

1. In addition to its request for a temporary restraining order, plaintiffs' complaint seeks a declaratory judgment that the proposed meeting on December 12, 1988 violates FACA. As the relief sought by plaintiffs is only as to this single meeting, the Court's resolution of the instant motion for a temporary restraining order would normally fully dispose of the case and warrant dismissal. However, plaintiffs notified the Court at oral argument held December 7, 1988 that they would be filing imminently an amended complaint accompanied by a motion for preliminary injunction.

2. The twelve members are Co–Chairmen Drew Lewis and Robert Strauss, Senator Peter Domenici (R., N.M.), Senator Daniel P. Moynihan (D., N.Y.), Representative Bill Frenzel (R., Minn.), Representative William H. Gray, III (D., Penn.), Lee A. Iacocca, Lane Kirkland, Dean Kleckner, Felix Rohatyn, Donald Rumsfeld, and Caspar Weinberger. Memorandum of Points and Authorities in Opposition to Motion for a Temporary Restraining Order ("Memo. in Opp."), at 1. The Commission shall be expanded to fourteen (14) members following the meeting of the Presidential Electors in December 1988. Omnibus Act, § 2102(a).

Pursuant to § 2103(b), the Commission must submit a final report to the President and Congress on March 1, 1989 [3] which "shall contain a detailed statement of the findings and conclusions of the Commission, including its recommendations for administrative and legislative action that the Commission considers advisable."

Congress specifically made the Commission subject to the requirements of FACA. Section 2104(f) of the Omnibus Act states that "[t]he Commission shall be considered an advisory committee within the meaning of the Federal Advisory Committee Act." FACA provides that "[e]ach advisory committee meeting shall be open to the public." 5 U.S.C.App. II, § 10(a)(1). The only exceptions to the open meeting requirement of § 10(a)(1) of FACA are the ten (10) exemptions contained in the Government in the Sunshine Act, 5 U.S.C. § 552b(c)(1)–(10), as amended. These exemptions are incorporated by reference into FACA.[4]

Exemption 9, the sole exemption invoked by defendants, states that a portion of an agency meeting may be closed to the public if the agency properly determines that a portion or portions of the meeting or the disclosure of information pertaining to such meeting is likely to

(9) disclose information the premature disclosure of which would—

(A) in the case of an agency which regulates currencies, securities, commodities, or financial institutions, be likely to (i) lead to significant financial speculation in currencies, securities, or commodities, or (ii) significantly endanger the stability of any financial institution; or

(B) in the case of any agency, be likely to significantly frustrate implementation of a proposed agency action,

except that subparagraph (B) shall not apply in any instance where the agency has already disclosed to the public the content or nature of its proposed action, or where the agency is required by law to make such disclosure on its own initiative prior to taking final agency action on such proposal.

5 U.S.C. § 552b(c)(9).

In August and September, 1988, the Commission held four closed meetings and planned to close a number of scheduled meetings to be held in the near future.[5] Plaintiff BNA wrote the Commission on September 20, 1988, to object to the Commission's asserted justification for closing its meetings: that a gathering of less than seven Commission members is not a meeting.[6] The Commission subsequently opened those future meetings.

On October 13, 1988, the Co–Chairmen of the Commission, Drew Lewis and Robert S.

---

**3.** On February 1, 1989, the President may issue an order extending the date for submission of the final report to September 1, 1989. Omnibus Act, § 2103(b)(3).

**4.** See 5 U.S.C.App. II, § 10(d) which provides in relevant part:

Subsections (a)(1) and (a)(3) of this section shall not apply to any portion of an advisory committee meeting where the President, or the head of the agency to which the advisory committee reports, determines that such portion of such meeting may be closed to the public in accordance with subsection (c) of section 552b of title 5, United States Code. Any such determination shall be in writing and shall contain the reasons for such determination.

**5.** According to plaintiffs, the four closed meetings were (1) August 9 on deficits and the economy; (2) September 7 on the Social Security Trust Fund; (3) September 13 on tax policies

and their effect on the economy; and (4) September 20 on defense spending and international affairs. The future meetings were (1) September 28 on new national priorities; (2) October 5 on entitlement programs other than Social Security; and (3) October 19 on major health programs. See Pl. Exhibit C, p. 1. The dates of the meetings according to defendants were August 9, August 24, September 7 and September 13. Defendants claim that the four closed meetings were information gathering sessions that were properly closed under 41 C.F.R. 101–6.-1004(k) (52 Fed.Reg. 45929 *et seq.*) because meetings of two or more advisory committee members convened solely to gather information or conduct research for a chartered advisory committee are meetings not covered by FACA and thus are not subject to § 10(a)(1). *See* Declaration of David Mathiasen, Executive Director of the National Economic Commission ("Mathiasen Decl."), ¶ 4.

**6.** Pl. Exhibit C.

Strauss, wrote to Richard G. Austin, Acting Administrator of GSA, requesting a "written determination that certain meetings and portions of meetings of the National Economic Commission may be closed under 5 U.S.C. Section 10(b)(c)(2)...."[7] This letter was supplemented by a letter from Lewis and Strauss to Austin dated October 24, 1988[8] and was amended by another letter dated October 26, 1988.[9] These communications urged that the meetings be closed in order to avoid premature exposure and reaction which "could significantly frustrate the implementation of the Commission's mandate ..."[10]

As a result of the letters, Austin issued a written determination on November 3, 1988, authorizing the Commission to close twelve (12) meetings scheduled between November 18 and December 16, 1988. The November 3 determination invoked the statutory language of exemption 9(B) of the Sunshine Act.[11]

On November 25, 1988, the Commission published a notice in the Federal Register that it would hold two meetings.[12] The first, on December 7, was to discuss econometric models and economic assumptions. The second, on December 12, was to review budget options. Of the two full days, only the one and one-half hour portion of the December 7 meeting devoted to econometric models was scheduled to be open to the public.[13] The asserted justification for closing the remaining portions of the two days of meetings was "to avoid the disclosure of information the premature disclosure of which would be likely to significantly frustrate the implementation of the Commission's mandate" pursuant to exemption 9 of the Sunshine Act, 5 U.S.C. § 552b(c)(9).[14]

7. Pl. Exhibit L, Def. Exhibit C; Mathiasen Decl., ¶ 5.

8. Pl. Exhibit M, Def. Exhibit D; Mathiasen Decl., ¶ 6.

9. Pl. Exhibit N, Def. Exhibit E; Mathiasen Decl., ¶ 6.

10. Pl. Exhibit M, p. 1.

11. *See* Pl. Exhibit K, Def. Exhibit F. The process of request by the Chairmen and the determination of the Administrator tracked the regulations governing advisory committees, 41 C.F.R. § 101–6.1023 (52 Fed.Reg 45929 *et seq.* (1987)), which states in relevant part
 (a) To close all or part of a meeting, an advisory committee shall submit a request to the agency head or, in the case of an independent Presidential advisory committee, the Administrator, citing the specific provisions of the Government in the Sunshine Act (5 U.S.C. 552b) which justifies the closure....
 (c) If the agency head, or in the case of an independent Presidential advisory committee, the Administrator agrees that the request is consistent with the provisions in the Government in the Sunshine Act and the Federal Advisory Committee Act, he or she shall issue a determination that all or part of the meeting be closed.

12. 53 Fed.Reg. 47779 (1988) (Pl. Exhibit A, Def. Exhibit G). Under the GSA rules, the public must be given fifteen (15) days advance notice of any meeting, including a statement of whether the meeting is to be closed. 52 Fed.Reg. 45932 (Dec. 2, 1987). Plaintiffs have alleged that the GSA has violated this rule. *See* Memorandum in Support of Plaintiff's Motion for a

Temporary Restraining Order ("Memo. in Support"), at 3–4, n. 1. Even accepting plaintiffs' position that they did not receive notice until Monday, November 28, 1988, GSA has given adequate notice as to the December 12, 1988 meeting.

13. Later the closed portion of the December 7 meeting was postponed until December 12.

14. The Commission's general counsel, Alexander Platt, subsequently elaborated on the explanation as to why exemption 9 applied to the two meetings. In an article by Toby McIntosh in the November 28, 1988 *Daily Report to Executives,* a BNA publication, Platt was quoted as saying "[t]he purpose of the commission is to make recommendations that will promote economic growth and assist the U.S. in maintaining a positive economic climate, and if improper inferences are made from partial information drawn from incomplete commission deliberations, that could undermine the very economic conditions which the commission is trying to maintain." Platt explained, referring to a recent appearance in front of the Commission by Federal Reserve Board Chairman Alan Greenspan, that "[o]n the basis of our latest experience with our public hearing, in which the market appeared to have been affected greatly, the presumption is that there will be considerable sensitivity to the recommendations of the commission on the financial markets. Premature disclosure of the information that arises in the course of making these recommendations could have an even more negative impact than simply a well-thought-out presentation of witnesses before the commission." Pl. Exhibit B.

On November 30, 1988, Platt informed Toby McIntosh, a reporter for the *Daily Report for Executives*, a BNA publication, that GSA had given written approval, as required by section 10(d) of FACA, to the Commission's decision to close the December 7 and 12 meetings as required by section 10(d) of FACA. In a letter to the Commission on December 1, 1988, plaintiffs Public Citizen, BNA, and Steve Wildstrom opposed the decision to close the meetings, explained why they believed the closing was unlawful, requested a copy of the GSA determination approving the closure, and demanded that the meetings be open to the public.[15] They advised Platt that if he did not inform them of a decision to open the meetings by 2:00 p.m. Friday, December 2, 1988, they would seek an injunction in federal court to prevent closure of the meetings to the public.[16]

Platt responded by letter dated December 2, 1988, enclosing a copy of the GSA determination. He further advised that it would be impossible to obtain definitive direction from the Commission by the stated deadline.[17]

In mid-afternoon, that date, plaintiffs' counsel telephoned the Commission's general counsel and was informed that the Commissioners had not yet considered plaintiffs' request and would be unable to do so until December 5, 1988, at the earliest. The Commission asked plaintiffs to refrain from seeking an injunction until the Commissioners had an opportunity to consider plaintiffs' request. Plaintiffs agreed. On the morning of December 5, 1988, the Commission's counsel advised plaintiffs' counsel that the Commission would not open their discussions of economic assumptions and budget options without a Court order. This was confirmed by a letter

from Platt to plaintiff Public Citizen on the same day.[18]

The instant lawsuit was filed that afternoon.

## II. DISCUSSION

### *Temporary Restraining Order Standards*

A temporary restraining order may be granted only when the plaintiff demonstrates (1) a substantial likelihood of success on the merits; (2) that irreparable injury will result in the absence of the requested relief; (3) that no other parties will be harmed if temporary relief is granted; and (4) that the public interest favors entry of a temporary restraining order. *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir.1977).

#### 1. Likelihood of Success on the Merits

As stated above, FACA provides that "[e]ach advisory committee meeting shall be open to the public." 5 U.S.C.App. II, § 10(a)(1), as amended. The enabling legislation of the Commission unambiguously states that "[t]he Commission shall be considered an advisory committee within the meaning of the Federal Advisory Committee Act (5 U.S.C.App.)." Omnibus Act § 2104(f) (1987).

The legislative history of the Sunshine Act clearly demonstrates that Congress intended that Act to "increase the public's faith in the integrity of government, enable the public to better understand the decisions reached by the Government, and better acquaint the public with the process by which agency decisions are reached."[19] The Sunshine Act is founded on the basic principle that "the government should conduct the public's business in public."[20]

---

**15.** Pl. Exhibit F. Plaintiff Washington Post delivered a letter concurring in the earlier letter. Pl. Exhibit H.

**16.** Pl. Exhibit F.

**17.** Pl. Exhibit J.

**18.** Pl. Exhibit O.

**19.** S.Rep. No. 94–354, 94th Cong., 1st Sess. 1 (1975).

**20.** S.Rep. No. 94–354, *supra* note 19, at 1. Similarly, the House Report states the "[t]he basic premise of the Sunshine legislation is that, in the words of Federalist No. 49, 'the people are the only legitimate foundation of power, and it is from them that the constitutional charter ... is derived.' Government is and should be the servant of the people and it should be fully accountable to them for the actions which it supposedly takes on their behalf." H.R.Rep.

The requirements of the Act were intended by Congress to establish "a presumption in favor of open meetings," reflecting "the philosophy of the bill that most government business can and should be conducted in the public eye." [21] Congress, in enacting the Sunshine Act, believed that "increased openness would enhance citizen confidence in government, encourage higher quality work by government officials, stimulate well-informed public debate about government programs and policies, and promote cooperation between citizens and government." *Common Cause v. Nuclear Regulatory Commission,* 674 F.2d 921, 928 (D.C.Cir.1982).

■ This general presumption of openness can be defeated if the discussion is reasonably likely to fall within one of the ten exemptions to the Sunshine Act. 5 U.S.C. § 552b(c)(1)–(10). However, exemptions to the Sunshine Act must be narrowly construed. *Common Cause,* 674 F.2d at 932. Furthermore, the burden is on the Commission to demonstrate that the invoked exemptions are applicable.[22]

It is undisputed that the general rule of openness applies to the Commission's meetings, the Commission being an advisory committee within the meaning of FACA. The only issue in dispute is whether exemption 9(B) of the Sunshine Act is appropriately invoked for the content of the December 12, 1988 meeting.[23] The legislative history of the Sunshine Act indicates that exemption 9 employs a balancing test between the presumption in favor of openness and the need to delay the disclosure of certain information in the interest of proper administration. The use of the word "significantly" in exemption 9(B) was intended by Congress to limit closings to

instances where disclosure at the time in question would have a considerable adverse effect.[24] It is with this legislative history in mind that we examine the instant case.

The December 12 meeting is to consist of two separate portions. The first addresses economic assumptions. The second involves deliberations by the members as to various budget options. The Court will address each portion separately.

### a. *Economic Assumptions*

■ Senior officials of the Office of Management and Budget and the Congressional Budget Office intend to present to the Commission their candid assessments of the present direction of the economy.[25] Counsel for defendants indicated at oral argument that these officials will make projections concerning future interest rates, unemployment, economic growth, and inflation. An open meeting would frustrate the Commission's ability to carry out its mandate, defendants assert, by preventing the "frankness" and "candor" of these government-employee witnesses, who may fear that their comments may influence various markets, both foreign and domestic.[26] It is the defendants' view that these witnesses are "properly" and "understandably reluctant" to make a "full, unvarnished presentation" due to concern about "unwarranted speculation on their observations," which speculation, in the absence of full understanding, could stimulate market fluctuations. In support of this position, defendants offer the declaration of David Mathiasen, Executive Director of the National Economic Commission. He states that

It is my judgment, shared by others and supported by literally decades of exam-

No. 94–880 (part 1), 94th Cong., 2d Sess. 2 (1976).

21. S.Rep. No. 94–354, *supra* note 19, at 19.

22. *Common Cause,* 674 F.2d at 929; *see* 5 U.S.C. § 552b(h)(1) ("The burden is on the defendant."); S.Rep. No. 94–354, *supra* note 19, at 19 ("Agencies wishing to close a particular meeting will have the burden of justifying their actions"). "The agency must show that it was more likely than not that exempt matters would be discussed at the closed portion or portions of

the meeting." *Common Cause,* 674 F.2d at 929, n. 19.

23. Exemption 9(A) of the Sunshine Act is clearly inapplicable.

24. H.R.Rep. No. 94–880 (Part 1), *supra* note 20, at 12.

25. Memo. in Opp., at 7; Mathiasen Decl., ¶ 14.

26. *See generally* Mathiasen Decl., ¶¶ 13–15.

ples, that the likelihood of reactions in the financial communities—both in the domestic economy and abroad—is so great as to prevent the commissioners from hearing in public from witnesses what they would hear in private, or prevent them from hearing some witnesses at all. No one experienced in economic policy matters with national consequence can question that senior economic officials should and do state less speculative views in public than they do in private, and quite properly so, since their statement *may precipitate economic events it is their responsibility to prevent if they can* .... [I]t is almost certain that the commission will be deprived of the participation by senior witnesses who are scheduled to appear on December 12 to assist the commission and its staff in its work from the Office of Management and Budget and the Congressional Budget Office if such meeting is made open to the public. These officials would be understandably reluctant to discuss publicly their own and their agencies' detailed thinking on matters such as economic forecasts that have had historically demonstrated financial market sensitivity and that are normally subject to careful review before being expressed publicly.... [T]hey could not, and should not, make a full, unvarnished presentation out of prudent caution about unwarranted speculation on their observations. (emphasis in original).[27]

Even were the witnesses completely candid, there remains a danger, defendants argue, that the implementation of the Commission's mandate would be significantly frustrated. In their October 24, 1988 letter to Richard Austin, Lewis and Strauss state their reasons for requesting that the December 12 meeting, as well as other future meetings, be closed to the public:

Premature disclosure of information relating to ... [recommendations relating to spending cuts, revenues, budget process reform and other legislative and regulatory changes that could assist in reducing the federal budget deficit] could significantly frustrate implementation of the commission's mandate because: 1) The commission's overall final recommendations will depend on the interrelationship of the many elements described above. Premature disclosure of a conclusion on any one of these elements would be very misleading in terms of understanding the totality of the commission's mandate and lead to a distortion of the commission's findings. This distortion could significantly frustrate the ability of the commission to reach a consensus; 2) it can be reasonably expected that there will be extensive public interest in the final recommendations of the commission. Premature disclosure of elements of the commission's final recommendations could present a misleading impression of a disproportionate and inequitable economic burden to be placed on any one economic group, social group, region or State. Avoiding such an inequitable and disproportionate allocation of burden is central to the commission's mandate and can only be reflected in the final recommendation of the commission, considered as a whole; 3) lacking a full understanding of the commission's recommendations, unwarranted and speculative fluctuations in financial and foreign exchange markets may occur, making the economic policy objectives of the commission more difficult to meet.

Defendants also point to an incident in which comments by Federal Reserve Chairman Alan Greenspan allegedly spurred a sharp decline in the value of the dollar as well as the Dow Jones average.[28]

Because the Commission is a particularly prestigious forum, subject to heightened scrutiny, the defendants contend that the effect on the economy of the comments made before the Commission is magnified.

---

27. Mathiasen Decl., ¶ 14.

28. Mathiasen Decl., ¶ 11. Mathiasen notes that the appearance of former Federal Reserve Chairman Paul Volcker at a Commission meeting on November 30 was not accompanied by a similar market reaction but suggests that the market had possibly already discounted his testimony given the similarity between Volcker's and Greenspan's view. *Id.* at ¶ 12.

This, the defendants argue further, creates a special concern that foreign and domestic markets will be adversely affected should the public's perception of the members' positions be misinterpreted.

The real question is, of course, whether these views, expressed fully and forthrightly in open meeting, would create such speculation, unrest, and reaction in the public forum or financial market so as to "significantly frustrate" the Commission's mandate. Other than a more concentrated expression, at one time by several persons and before this forum, the expressions to be presented by these officials are no different than the plethora of economic assessments and predictions (some optimistic, some grave) that inundate the public daily. This country has just experienced, during the course of the recent political process, months upon months of extensive, and intensive, national public debate on the very issues that the Commission is addressing. Candidates for the highest offices of our nation, candidates for Congress, high government officials, and numerous prestigious economic advisers/experts have openly stated, and debated, through varied fora, their assessments of, and projections for, the national economy, including solutions for reducing the deficit and whether taxes should, could, or would be raised. There have been individual declarations of position; there have been representatives of government speaking openly on these matters. It is a rare day when television, radio, or the print media do not present discussion or speech (whole or in part) in which government officials and other prominent experts argue the current state of the economy and predict where we are headed as a nation.

Yet, defendants attempt to distinguish the current debate before the Commission as deserving of special protection because of the prestigious composition of the Commission and the mandate it shoulders. Defendants' arguments are unpersuasive. We are concerned now with economic as-

sumptions and assessments of the witnesses, not the ultimate recommendations of the Commission. It is reality that public disclosure by these government officials, in this forum or any other public forum, *may* engender *some* speculation and *may* have some unknown and unquantifiable effect on various markets. But this effect (and it would speculation to expect that the effect would always be negative) must be balanced against the open society and unfettered public debate on important national issues upon which our democracy is founded. Although defendants vigorously assert a concern that open meetings will create rampant speculation, they are hard pressed to dispute that partial information, inaccurate rumors, and even, on occasion, leaks, that often emanate from secrecy and closed-door meetings, can be far more encouraging of speculation than full, open disclosure.

The plaintiffs have shown a substantial likelihood of prevailing on the merits and have demonstrated substantial legal doubts about the defendants' invocation of Exemption 9(B) to close the December 12 meeting with its proposed agenda.

b. *Budget Options*

At the second portion of the December 12 meeting, "various budget options will be discussed during deliberations by the members." [29] Defendants insist that "[s]uch deliberations cannot take place in public," [30] asserting that an open meeting will frustrate implementation of the Commission's mandate by stifling the openness of the deliberations among its members. This, they claim, will result in an ultimate recommendation that will be skewed because the members will withhold their true views. Plaintiffs, on the other hand, contend that, based on the Commission's October request for a GSA determination that Exemption 9 applied to *all* meetings in which the Commission might discuss its findings, conclusions, and recommendations, defendants are "asserting a broad deliberative process

---

**29.** Memo. in Opp., at 7.

**30.** *Id.* at 7–8.

privilege under which it seeks to stop the public from witnessing it do its work." [31]

The Commission acknowledges that such a broad approach towards closed meetings was unequivocally rejected by the Court of Appeals in *Common Cause*, where it held that exemption 9(B) does not encompass the deliberative process privilege protected by the Freedom of Information Act, 5 U.S. C. § 552(b)(5).[32] Yet, defendants maintain that "in the context of the instant case, it is necessary to take such a step on a limited basis, and that step is completely consistent with the intent of the framers of the Government in the Sunshine Act that meetings be closed if they 'would be likely to significantly frustrate implementation of' the objectives of the agency. 5 U.S.C. § 552b(c)(9)(B)." [33] The Court cannot agree.

Careful scrutiny of the Mathiasen Declaration and the Commission's request to GSA for a determination that all twelve meetings should be closed clearly reflect that Commission's assertion of a broad deliberative process privilege to cloak the Commission's work in secrecy until the final report issues. *Common Cause* unambiguously condemns such action.

In *Common Cause*, plaintiffs brought suit to enjoin defendant Nuclear Regulatory Commission ("NRC") from conducting closed meetings to discuss preparation of its annual budget request. Emphasizing the entitlement of the public to the fullest information possible regarding decisionmaking processes of government, the court discussed the purposes of the Sunshine Act, soundly rejecting NRC's argument that its budget deliberation process fell within exemption 9(B) of that Act:

> During the legislative process a number of federal agencies specifically objected to the Sunshine Act's omission of an exemption for predecisional deliberations. Congress deliberately chose to forego the claimed advantages of confi-

dential discussions among agency heads at agency meetings.

674 F.2d at 929.

> [C]ongress decided not to provide any exemption for predecisional deliberations because it wished the process of decision as well as the results to be open to public view.

*Id.* at 932.

> [A]n overly broad construction of Exemption 9(B), which applies to all agencies subject to the Act, would allow agencies to 'circumvent the spirit of openness which underlies this legislation.' S.Rep. No. 94–354, *supra*, at 20.

*Id.* at 932–933. The Court ultimately concluded that no provision or exemption to the Sunshine Act provided a blanket exemption for any stage of budget discussions. *Common Cause* made clear that "the availability of exemptions for specific portions of budgetary discussions must be determined on the facts of each case." *Id.* at 923.

Here, defendants are not seeking an exemption for portions of the budgetary discussions before the Commission; they are seeking an exemption for the entire debate over budget options. The Commission's insistence on shielding the debate as to budget options from public scrutiny directly contravenes the law of *Common Cause* as it chops the core of our democratic society: open, robust, unvarnished public debate illuminating pressing issues, concerns and policies that affect the lives of all citizens. Fear flourishes when the process is shrouded in a cloak of secrecy and the swiftest transport to speculation is fear.

In enacting FACA and the Sunshine Act, Congress, speaking the will of the people, demanded that the public view the components of decisionmaking so that the people would understand the reasons for the decision as well as the results themselves. Fealty to this entitlement becomes even more warranted where vital public policy options, as here, are under consideration by an agency of the Federal Government.

---

**31.** Memo. in Support, at 11.

**32.** 674 F.2d at 928–29.

**33.** Memo. in Opp., at 8–9.

The meeting to be held on December 12 with its proposed agenda of budget option discussion during deliberations by members of the Commission is precisely that kind of vigorous, free-flowing advisory discourse and debate that Congress intended advisory committees to undertake in the eye of the public. Plaintiffs are likely to prevail on the merits of their demand for an open meeting on December 12.

### 2. Irreparable Harm

In the absence of injunctive relief, plaintiffs will be irreparably harmed. Should the December 12 meeting proceed behind closed doors, plaintiffs will be denied, perhaps for all time,[34] but at a minimum during the on-going course, that which Congress expressly protected through FACA. The right to view the advisory committee's discussion of policy matters in public and the right to confront, through observation, the decision-making process as it occurs, will be obviated.

### 3. Balancing of the Equities and the Public Interest

For the reasons stated above, and wholly consistent with legislative intent and existing law, it is evident in this case that the public has the right to know the issues at discussion as they develop at the December 12 meeting: the economic assumptions and assessments of the expert and senior government presenters and the budget options of consideration by the commissioners on issues relating to the Federal budget deficit. The harm to defendants, if any, is minimal at most, as they receive openly the full and truthful testimony of the senior officials for consideration and while the members of the Commission openly and vigorously probe and debate the issues. Rather than harm, this will highlight vividly the essence of our democratic society, providing the public its right to know how its government is conducting the public's business.

### III. CONCLUSION

Plaintiffs have successfully carried their burden of showing they are entitled to the relief they seek. Each of the factors discussed above favors entry of a temporary restraining order barring defendants from closing the December 12, 1988 meeting with its proposed agenda, at which meeting, witnesses will appear and present economic assumptions and assessments and at which meeting the members of the Commission will discuss those assumptions and review budget options. The plaintiffs have a substantial likelihood of prevailing on the merits; immediate and irreparable injury will result in the absence of an injunction; the defendants are minimally harmed, if at all; and the public interest in an open meeting will be realized. Accordingly, temporary injunctive relief is warranted and shall be granted.

A separate Order accompanies this Memorandum.

### ORDER

For the reasons set forth in the Memorandum Opinion issued this date, it is

ORDERED that plaintiffs' motion for a temporary restraining order be and it hereby is granted. It is

FURTHER ORDERED that for a period to expire on December 19, 1988 at 11:15 a.m. (unless further extended for good cause), defendants, The National Economic Commission and Administrator of the General Services Administration, shall not close to the public the meeting scheduled for December 12, 1988 to receive economic assumptions and assessments of senior officials of the Office of Management and Budget and the Congressional Budget Office on the present direction of the economy (including projections concerning future interest rates, unemployment, economic growth, and inflation) and the discussions

---

**34.** Defendants suggest that "[t]he protection of the closed meeting was not intended to last forever, and records of reasonably segregable portions of the proceedings will be made available to requesters after the testimony on December 12." Memo. in Opp., at 9. No one can predict at this time, not even the Commission, what portions, if any, of the transcripts, and when, it will decide to release to the public after the December 12 meeting.

and deliberations of the commissioner members of The National Economic Commission on budget options. It is

FURTHER ORDERED that plaintiffs shall post with the Clerk of the Court a bond totalling $100.00 in cash or surety no later than 3:00 p.m. December 9, 1988, failing which this temporary restraining order shall stand immediately dissolved. It is

FURTHER ORDERED that, in consideration of the immediacy of the matters hereby enjoined and for the reasons stated in the Memorandum Opinion for the grant of this injunction, there shall be no stay of this Order beyond 3:00 p.m. this date in the event defendants elect to note an appeal. It is

FURTHER ORDERED that on or before December 12, 1988, the plaintiffs, should they elect to pursue the matter, and in order to avoid dismissal of their complaint at the end of the injunctive period, must file an amended complaint accompanied by a motion for preliminary injunction. In the event the plaintiffs timely make such filing, the defendants must respond to the preliminary injunction motion no later than December 16, 1988 on which date, at 9:00 a.m., there shall be a status to determine the future course of this litigation.